*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DONALD J. MOLOSKY; ELIZABETH A.
MOLOSKY,

                *Plaintiffs-Appellants,*

     *v.*

WASHINGTON MUTUAL, INCORPORATED;
FEDERAL DEPOSIT INSURANCE CORPORATION,
                *Defendants-Appellees.*

No. 08-1416

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-11247—Bernard A. Friedman, District Judge.

Argued: October 11, 2011

Decided and Filed: December 22, 2011

Before: MOORE and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Thomas A. Biscup, PAUL ZEBROWSKI & ASSOCIATES, P.C., Shelby Township, Michigan, for Appellants. J. Scott Watson, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Appellees. **ON BRIEF:** Thomas A. Biscup, Paul Zebrowski, PAUL ZEBROWSKI & ASSOCIATES, P.C., Shelby Township, Michigan, for Appellants. Stephen M. Rummage, Jonathan M. Lloyd, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, for Appellees.

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

ROGERS, Circuit Judge.  When Donald and Elizabeth Molosky paid off their home mortgage early, they were charged a $30 "payoff statement fee" and a $14 "recording fee" in connection with the prepayment.  They sued in federal court challenging the imposition of these fees as violations of the mortgage contract, of various Michigan laws, and of the federal  Real Estate Settlement Procedures Act (RESPA).  The district court dismissed the suit in its entirety on the grounds that all of the state-law claims were preempted by the federal  Home Owners' Loan Act (HOLA), and that the allegations failed to state a claim under RESPA.  One of the contract-based claims was not preempted by HOLA, however, and requires a remand for further consideration.  The other claims were all properly dismissed, although we dispose of some of the state-law claims on the ground of failure to state a claim rather than on federal preemption.

I.

The Moloskys obtained a home loan secured by a mortgage from the Bank of Ann Arbor.  The note included a paragraph labeled "Borrower's Right to Prepay" that included the following sentence: "I may make a full Prepayment or partial Prepayments without paying a Prepayment charge."  The mortgage included a paragraph labeled "Release" that included the following sentence: "Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law."  Defendant Washington Mutual later acquired servicing rights for the note.

The Moloskys paid off their note before its maturity.  Washington Mutual charged them a $30 "payoff statement fee" and a $14 "recording fee" in connection with the prepayment.  The Moloskys brought a class action in the court below alleging that the two fees violated three Michigan state statutes and the RESPA, 12 U.S.C. § 2601 *et*

*seq.*, and that the fees also constituted a breach of contract. Washington Mutual responded by filing a motion to dismiss, arguing that the state law and contract claims were preempted by the HOLA, 12 U.S.C. § 1461 *et seq.*, and that the Moloskys failed to state a claim under RESPA.

After some proceedings described in greater detail below, the district court held that all of the Moloskys' state-law claims, including the breach of contract claim, were "expressly preempted by 12 C.F.R. § 560.2(b)(5) and (b)(12)," regulations implementing HOLA, because the claims "are based on the allegation that defendant collected improper 'loan-related fees' or prepayment charges." The district court held that "[s]tate law simply may not regulate such matters" in the face of the Office of Thrift Supervision's clear intent to occupy the field, and so the claims were preempted under HOLA. The district court dismissed the RESPA claim for two independent reasons, one of which was that the payoff statement fee was not a "settlement service" within the meaning of 12 U.S.C. § 2607. Following an unsuccessful motion for reconsideration, the Moloskys bring this timely appeal.

## II. Michigan Usury Act claim

The district court properly dismissed the Moloskys' claim under the Michigan Usury Act as preempted by HOLA. Preemption claims under the Home Owners' Loan Act are governed by the implementing regulations of the Office of Thrift Supervision (OTS).[1] The Moloskys' claim based on the Michigan Usury Act, M.C.L. § 438.31, is preempted according to the explicit terms of 12 C.F.R. § 560.2(b). The Michigan law, which prohibits among other things the charging of certain types of prepayment fees, is the type of state law explicitly listed as preempted in § 560.2(b), which extends

---

[1]Passage of the Dodd-Frank Act has changed both the type of preemption applicable under HOLA and the identity of the agency that oversees federal savings and loan associations. *See* 12 U.S.C. §§ 1465(a), 5412(b). These provisions came into effect on July 21, 2011, and have no retroactive effect with regard to the issues in this appeal. There is no explicit statement from Congress that they are meant to be retroactive, suggesting no retroactivity. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The Dodd-Frank Act itself declares that its contents should not be construed as retroactive. *See* 12 U.S.C. § 5553; *see also Davis v. World Sav. Bank, FSB*, No.10-1761, 2011 WL 3796170, at *5 n.5 (D.D.C. Aug. 29, 2011).

preemption to "state laws purporting to impose requirements regarding . . . (5) Loan-related fees, including . . . prepayment penalties, servicing fees, and overlimit fees."

Congress gave the OTS broad authority under HOLA "to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations . . . giving primary consideration of the best practices of thrift institutions in the United States." 12 U.S.C. § 1464(a). The Supreme Court has found this power to be very broad, and exclusive: "Congress plainly envisioned that federal savings and loans would be governed by what the [OTS]—not any particular State—deemed to be the 'best practices.'" *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 161 (1982). Pursuant to this grant, the OTS has issued regulations that assert its authority "to promulgate regulations that preempt state laws affecting the operations of federal savings associations" and that are intended to "occup[y] the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). To that end, the OTS has laid out a system of regulation "so pervasive as to leave no room for state regulatory control." *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008) (internal citation omitted). Moreover, there is no presumption against preemption here; the state regulations are intruding into an area of law with "a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see also Wimbush v. Wyeth*, 619 F.3d 632, 642 (6th Cir. 2010).

Contrary to the Moloskys' claims, HOLA preemption is applicable in situations where, as here, a federal savings association did not originate the loan but instead later serviced it. The grant of power to the OTS is very broad, and through 12 C.F.R. § 560.2 it has elected to make use of that breadth. State laws that propose to regulate a federal organization's lending activities, or affect them in a more than incidental way, are preempted. The situation before us is precisely the sort to fit the OTS's purview. The Moloskys are protesting the legality of payoff statement fees and recording fees, fees charged to them by Washington Mutual, a federal savings and loan association. The claim is predicated on the actions of Washington Mutual that occurred after the loan was

transferred, and so are premised on the argument that state laws should regulate Washington Mutual's actions.  The valid OTS regulation clearly preempts such suits.

The Moloskys' argument against this conclusion, predicated on one paragraph of an OTS opinion letter and several cases from the 1980s and 1990s, is unconvincing. The state court and federal district court cases predate the current version of OTS regulation on preemption, which is far broader and more detailed than any of its predecessors, making their analysis largely inapplicable.  The OTS opinion letter, somewhat ambiguous, appears to require that a loan originator be a federal savings association in order to be exempt from state requirements dealing with origination.  *See* Re Preemption of Georgia Fair Lending Act, OTS Op. Letter (Jan. 21, 2003) at 4 (available at http://www.ots.treas.gov/_files/56301.pdf).  It does not follow that when a federal savings association *services* a loan previously originated by a state bank that the federal savings association is subject to state requirements regarding servicing.

This is not a situation like that distinguished in *In re Ocwen Loan Servicing*, 491 F.3d 638 (7th Cir. 2007), where "state law purported to forbid servicing or prescribe the terms of the assignment." *Id.* at 645.  The Moloskys are not contesting that Washington Mutual was legally allowed to service the loan, but rather that Washington Mutual's servicing violated state law.

### III. Contract claim on the payoff statement fee

However, the Moloskys' breach of contract claim with regard to the payoff statement fee is not preempted by HOLA.   The contract provision in question is a paragraph labeled "Borrower's Right to Prepay" that included the following sentence: "I may make a full Prepayment or partial Prepayments without paying a Prepayment charge."  Neither this term of the contract nor the state contract law that applies to it is one of the types of state law listed as preempted in 12 C.F.R. § 560.2(b), not least because the contract provision, although enforceable under state law, is imposed by the contracting party upon itself. The Supreme Court distinguished contract terms stipulated by a regulated party in just this way in a case involving federal preemption of airline regulation, noting the "distinction between what the State dictates and what the airline

itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *American Airlines, Inc., v. Wolens*, 513 U.S. 219, 233 (1995). Section 560.2(a) does generally provide for the preemption of "state laws purporting to regulate or otherwise affect [federal savings association] credit activities," but this broad preemption is explicitly limited by § 560.2(c), which excepts "Contract and commercial law" from preemption "to the extent that [such state laws] only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a)."

To hold Washington Mutual to the terms of its contract with the Moloskys is consistent with the purposes of the OTS's regulation. The Seventh Circuit's analysis in this regard is persuasive:

> [W]e read subsection (c) to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies. Suppose an S & L signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the mortgagee (or a servicer like Ocwen) fraudulently represents to the mortgagor that it will forgive a default, and then forecloses, it would be surprising for a federal regulation to bar a suit for fraud. Some federal laws do create such bars, notably ERISA, see 29 U.S.C. §§ 1132(a), (e), but this is recognized as exceptional. Enforcement of state law in either of the mortgage-servicing examples above would complement rather than substitute for the federal regulatory scheme.

*In re Ocwen*, 491 F.3d at 643-44 (citations omitted). Indeed, the OTS anticipated this very situation when it allowed prepayment fees only "[s]ubject to the terms of the loan contract." 12 C.F.R. § 560.34. Moreover, the comments to the regulation make clear that "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions," 61 Fed. Reg. 50966.

It is true that § 560.2(c) is not meant to be used "to open the door to state regulation of lending by federal savings associations." *In re Ocwen*, 491 F.3d at 643. The OTS has recognized that common law can be used to regulate federal savings associations as surely as statutes. There may be cases where permitting breach of contract claims may not be consistent with the purposes of HOLA, such as when state contract law interposes unstated or implied terms into a contract. *See Schilke v. Wachovia Mortg., FSB*, 758 F. Supp. 2d 549, 556-57 (N.D. Ill. 2010) (citing *In re Ocwen*, 491 F.3d at 646); *Moskowitz v. Washington Mut. Bank, FA*, 768 N.E.2d 262, 266 (Ill. App. Ct. 2002). The Supreme Court in the *American Airlines* case indeed recognized the difference between state contract law that seeks to effectuate a state's public policies and contract law that seeks to effectuate the intent of the parties. *American Airlines*, 513 U.S. at 233 & n.8. But the claim we are considering does not present the former case. If explicit terms of a contract like those suggested by the Seventh Circuit, and like the contract provision in this case, are not preempted, then it is hard to conceive of any situation in which § 560.2(c) would apply.

Lending practices cannot be more than incidentally affected by claims that "merely seek[] to make defendants live up to the word of their agreements they sign with their customers." *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 164 (E.D.N.Y. 2009). In this respect, breach of contract claims are even more clearly not preempted than claims that an association has violated state laws that prohibit deceptive acts and practices. The OTS itself has said that such claims only incidentally affect lending practices, "because federal thrifts are presumed to interact with their borrowers in a truthful manner." Preemption of State Laws Applicable to Credit Card Transactions, OTS Op. Letter (Dec. 24, 1996) at 10 (available at http://www.ots.treas.gov/_files/56615.pdf). The opinion letter goes on to say that interpreting and applying the deceptive practices laws of multiple states presents no issue as far as preemption is concerned. *Id.* It follows that a breach of contract claim which, as here, does not purport to impose additional terms on a contract, but only to hold federal savings and loan associations to "the basic norms that undergird commercial

transactions," *id.* at 9, only incidentally affects lending operations, and so is not preempted.

Washington Mutual argues against such a conclusion by claiming that the contract clause the Moloskys cite does not apply to the payoff statement fee, because it is not a prepayment fee. This argument goes to the merits of the contract claim, not to whether the claim is preempted. It is illogical to say that the validity of a contract claim must be determined before a court can decide if that claim has been preempted. Rather, a court should be able to determine from the contract and the complaint whether a claim is the sort that is preempted. Any further inquiry is a matter of contract interpretation analytically distinct from the threshold preemption analysis.

Because the district court dismissed the Moloskys' contract claim on preemption grounds, it did not consider whether the Moloskys have stated a valid claim. The answer to that question hinges on whether the payoff statement fee qualifies as a prepayment fee, and requires an inquiry into both the nature of the fee and relevant case law. As the Supreme Court in the *American Airlines* case stated, "That question of contract interpretation has not yet had a full airing, and we intimate no view on its resolution." 513 U.S. at 234.

### IV.  Other state-law claims

The remainder of the Moloskys' state-law claims fail to state a cause of action, and are more readily disposed of on those grounds than on the preemption ground relied upon by the district court. We may of course affirm a district court's judgment on legal grounds not relied upon by the lower court. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003).

### A.  Michigan Deed Recording Statute claim

The Moloskys have failed to state a claim under the Michigan Deed Recording Statute, M.C.L. § 565.41, because the plain meaning of M.C.L. § 565.41 requires only that the mortgagee pay a recording fee when it discharges the mortgage. It says nothing about prohibiting mortgagees from recouping that fee later on. The only express cause

of action the statute provides appears in a companion section; it declares a mortgagee liable to a mortgagor if the mortgagee fails to discharge the mortgage properly. M.C.L. § 565.44. Since a statute's plain meaning must be understood by looking at "the language and design of the statute as a whole," we must consider the statute as a whole to clarify potential ambiguity. *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) (quoting *United States v. Meyers*, 952 F.2d 914, 918 (6th Cir. 1992)). M.C.L. § 565.44 makes it clear that the legislature intended to create a cause of action only when a mortgagee "refuses or neglects to discharge the mortgage as provided." *Id.* There is no discernible purpose in the statute for prohibiting the charging of a recording fee to the borrower.

The conclusion that the legislature did not intend to forbid the charging of recording fees through M.C.L. § 565.41 is strengthened by comparing the statute to another Michigan statute. M.C.L. § 438.31a explicitly allows a bank to charge "recording fees" to recoup those it has paid, forbidding only the billing to a borrower of a "charge for inspection required by a local unit of government." Although the section does not apply to federally chartered savings and loan associations, and so is not applicable directly to this case, the section's explicit prohibition of inspection charges stands in marked contrast to both its allowance of recording fees and M.C.L. § 565.41's silence with respect to recording fees. If two statutes are capable of co-existence, the court should construe them as such. *See Beckert v. Our Lady of Angels Apartments, Inc.*, 192 F.3d 601, 606 (6th Cir. 1999). To read M.C.L. § 565.41 to prohibit mortgagees from charging recording fees would place it in direct contradiction with M.C.L. § 438.31a in every case that does not involve a federal savings and loan association. M.C.L. § 565.41 does not prohibit the charging of recording fees, and so the Moloskys have failed to state a claim.

### B. Contract claim based on the recording fee

The Moloskys' claim for breach of contract regarding the recording fee was properly dismissed because the claim is based on the contention that the fee is prohibited

by Michigan's recording statute.  The fee is not so prohibited, for the reasons given in the previous section, and so the Moloskys have failed to state a claim.

### C.  Michigan Consumer Protection Act claim

The Moloskys also fail to state a claim under Michigan Consumer Protection Act, M.C.L.§ 445.901 *et seq.*, because the Michigan Consumer Protection Act by its own terms does not apply to Washington Mutual.  M.C.L. § 445.904(1)(a) exempts any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Washington Mutual is specifically authorized by the OTS to "invest in, sell, or otherwise deal in . . . [r]esidential real property loans."  12 U.S.C. § 1464(c)(1)(B).

Such a general authorization is sufficient to exempt Washington Mutual under Michigan law.  In *Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203 (2007), the Supreme Court of Michigan explained the phrase to mean that the general transaction at issue, "*not the alleged misconduct*," must be mentioned specifically as authorized, *id.* at 209 (emphasis in original) (internal citation omitted).  In *Liss*, the court held that a statute that defined a residential home builder as "one who engages in construction activities for a fixed sum, price, fee, percentage, valuable consideration, or other compensation" was sufficient to constitute specific authorization for a residential home builder "to contract to build homes." *Id.* at 214 (internal quotation marks and citations omitted). Because "[f]orming an agreement to build a home is the essence of a residential home builder's activity," the contract to build a residential home was exempted from the Michigan Consumer Protection Act, and all claims resulting from it were dismissed. *Id.* at 215.

Because the fees at issue in this case are part of authorized general transactions—the service of real property loans—they are exempted.  Moreover, Washington Mutual properly pled the exemption in its original motion to dismiss, thereby meeting the requirement recognized in *Guira v. Bartolomeo*, No. 291952, 2010 WL 3767563, at *2 (Mich. Ct. App. Sept. 28, 2010).  The Moloskys' argument that the transaction that must be authorized is actually "purchasing mortgage loans from state-

chartered banks and then charging the borrower fees . . . in direct breach of contract" is both more specific than the *Liss* standard requires and improperly looks to the alleged misconduct rather than the transaction itself, which is loan servicing. The Michigan Consumer Protection Act is not applicable to Washington Mutual on the facts of this case.

## V. RESPA claim

The Moloskys have failed to state a claim under RESPA because 12 U.S.C. § 2607, under which they have brought their claim, does not apply to fees assessed after a property's settlement. 12 U.S.C. § 2607(b) concerns real estate "settlement service[s]." 12 U.S.C. § 2602(3) defines "settlement services" to include "any service provided in connection with a real estate settlement" and includes a non-exhaustive list. The relevant federal agency has not interpreted settlement services to include post-settlement fees like those challenged in this case. The Department of Housing and Urban Development (HUD), which is charged with administering RESPA, defined "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b). The definition goes on to provide examples of settlement services. Although HUD's list of settlement services is not meant to be exhaustive, every one of them is assessed before the property passes into the hands of the homeowners, i.e. at purchasing. A number of items are so limited by their very terms. For example, the first item in the list is "*[o]rigination* of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans)" *id*. (emphasis added). HUD's definition indicates that settlement means the point at which the property is transferred, not what follows, and so the list supports a reading of "settlement services" limited to those assessed before or at the property transfer.

Every case to consider directly the meaning of "settlement services" has read the term as so limited. The Ninth Circuit said the term "was not intended to apply to costs paid by property owners after the settlement at which they bought the property." *Bloom v. Martin*, 77 F.3d 318, 320-21 (9th Cir. 1996). The district court in *McAnaney v.*

*Astoria Fin. Corp.*, 357 F.Supp.2d 578, 590 (E.D.N.Y. 2005), has provided compelling reasoning in support of this conclusion:

> Given the vagueness of the word settlement in the statute, the Court affords deference to HUD's regulation stating that "settlement services" is the "process of executing legally binding documents regarding a lien on property." Blacks law dictionary defines a "closing," also known as "settlement," as "[t]he final meeting between the parties to a transaction, at which the transaction is consummated; esp., in real estate, the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred." Black's Law Dictionary (8th ed.2004). In addition, RESPA was enacted to protect consumers from unnecessary fees while purchasing a home. Further, nothing in the relevant portion of RESPA, its implementing regulations, or the plain meaning of the statute indicate a reason to extend the coverage of "settlement services" to the satisfaction, prepayment, or release of a mortgage.

*Id.* The Second Circuit's decision in *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007), is not contrary to this analysis because *Cohen* involved a fee assessed at the time of the loan origination, when Cohen refinanced her mortgage. *See id.* at 113-14.

The Moloskys argue that "settlement services" in this section can be equated with the words "servicing of mortgage loans" in a separate provision of the Act, 12 U.S.C. § 2605. The argument is without merit because the language of the two provisions is obviously distinct, and the two provisions plainly impose different requirements. There is no basis to use the language in one provision to expand the meaning of language in a different provision.

Because the payoff statement fee was not assessed until the time of prepayment, it is not a settlement service within the definition of 12 U.S.C. § 2603 and so the Moloskys have failed to state a claim. We need not rely on the district court's alternative basis for rejecting the RESPA claim—that section 8(b) of RESPA applies only if the fee is divided between two or more parties. That issue is presently before the Supreme Court. See *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799 (5th Cir. 2010), *cert. granted,* 80 U.S.L.W. 3217 (U.S. Oct. 11, 2011) (No. 10-1042).

VI. Due process challenge to the procedure in the district court

The Moloskys contend that the district court erred procedurally when it dismissed the complaint without permitting additional briefing. The district court, however, did not abuse its discretion in this regard.

As described above, Washington Mutual filed a motion to dismiss, arguing that the state law and contract claims were preempted by HOLA, and that the Moloskys failed to state a claim under RESPA. After the Moloskys filed their reply, which included extended discussion of the law involved, the district court ordered them to show cause why their complaint should not be dismissed due to lack of both subject matter and diversity jurisdiction. The district court expressed doubt as to whether RESPA applied to the Moloskys' case due to the statute's definition of "settlement services," an issue not raised before this point. The Moloskys responded by filing a motion requesting leave to file a second amended complaint in which they would address the concern. The motion included a little information regarding the definition of "settlement services," but noted that "Plaintiffs refrain from a full briefing of the issue at this time."

The district court granted the motion, the Moloskys filed their second amended complaint, and Washington Mutual again filed a motion to dismiss. The motion incorporated everything from Washington Mutual's previous motion to dismiss, and added that the Moloskys failed to state a claim under RESPA because of the definition of "settlement services," an issue Washington Mutual had briefed when the court ordered the Moloskys to show cause two months earlier. On January 14, 2008 the district court ordered an extension of time for responsive pleadings until January 25. Then, on January 18, without receiving responsive pleadings, the district court issued its opinion dismissing the complaint on all grounds.

The court had been fully briefed on every issue except the "settlement services" issue following the first amended complaint. Even that issue was treated, albeit briefly, by plaintiffs in their motion to amend the complaint, such that the district court considered that the issue had been sufficiently addressed. The district court's assessment was not an abuse of discretion, particularly in light of the fact that the court ultimately

decided the RESPA issue should be dismissed on two independent grounds, one of which had already been fully briefed during the period following the first amended complaint. It follows that had the "settlement services" issue never been raised, the complaint would still have been dismissed by the district court. Realizing this, the court concluded that it needed no further information to dismiss the complaint.

Moreover, the Moloskys offer no valid suggestion as to how this perceived wrong can be remedied. To remand the case on this ground at this point would serve no purpose. We have had the opportunity to review the entirety of the Moloskys' argument de novo with regard to "settlement services." The Moloskys' argument before this court mirrors that hastily sketched for the district court. As we agree with the reasoning of the district court's opinion on this question, a remand will simply delay the inevitable ruling of dismissal of the charge. Regardless of whether the Moloskys were wronged at the district court level, this court has afforded them the full opportunity to be heard, and has still found their arguments unconvincing.

We recognize that despite the fact that the district court was acting within its discretion, the results were "strange and surprising" to the Moloskys, as they point out in their brief. Although this surprise does not rise to the level of a due process violation, the district court would have been well advised to wait until the end of the responsive pleading period to issue its ruling.

## VII. FDIC motion to dismiss

Finally, events following the district court's entry of judgment did not deprive either this court, or the district court, of jurisdiction, as contended in the motion to dismiss filed by defendant Federal Deposit Insurance Corporation (FDIC), the receiver for Washington Mutual.

After briefing was completed on this appeal, on September 25, 2008, the Office of Thrift Supervision closed Washington Mutual Bank and appointed the FDIC receiver. On October 21, the FDIC filed a motion to substitute itself as receiver in the appeal and to stay the proceedings for 90 days pursuant to 12 U.S.C. § 1821(d)(12)(A)(ii), part of

the Financial Institution Reform, Recovery, and Enforcement Act (FIRREA).  This court granted the motion, and ordered a stay until December 25, 2008.

The FIRREA allows a receiver to make use of an administrative claims process, the requirements of which are outlined in § 1821(d)(3)-(13), to determine claims against the banking institutions the receiver represents.  The FDIC mailed notice and instructions regarding the administrative claims process to the Moloskys on February 11, 2009.  On March 6, 2009, the FDIC filed two motions with this court seeking (1) a stay of proceedings until the administrative claims process was completed under the FIRREA, and (2) a continuance or postponement of oral argument.  The first of these two motions requested us to stay proceedings until:

> (i) the date on which the FDIC-Receiver makes a determination on any administrative claim filed by the Moloskys; (ii) the expiration of the 180-day period following the filing of a claim by the Moloskys; or (iii) May 12, 2009, if the Moloskys fail to file an administrative claim by that date.

We granted the motions on March 17 and 19, 2009, and directed counsel to "advise the Clerks Office when the stay of appeal is ready to be lifted."

The Moloskys filed a claim under the FIRREA claims procedure on May 5, 2009, to which they received no response.  The case then lay dormant for 17 months until December 6, 2010, when this court ordered counsel for FDIC to "update the court as to when the appeal can be scheduled for oral argument."  On December 13, 2010, FDIC counsel filed the report, as well as a motion to dismiss the case for lack of jurisdiction. The motion argued that under 12 U.S.C. § 1821(d), the Moloskys were required to take affirmative action in order to "continue" their judicial action within the statute of limitations laid out in § 1821(d)(6)(B)(ii).  According to the FDIC, because the Moloskys had not so "continued" their action, their claim was disallowed and all courts were stripped of subject matter jurisdiction under § 1821(d)(13)(D).  It is not entirely clear whether the FDIC was seeking dismissal of the *appeal* for lack of our jurisdiction, thereby leaving the district court judgment intact, or seeking an exercise of our jurisdiction to direct the *district court* to dismiss for lack of subject matter jurisdiction.

In either event, the motion must be denied, as the jurisdiction-stripping provisions of §§ 1821(d)(6)(B)(ii) and (13)(D) do not apply.  Section 1821(d) states that a claimant may request administrative review or else "file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States" and adds that "such court shall have jurisdiction to hear such claim." § 1821(d)(6)(A).  The claimant may file or continue within 60 days of either (i) a notice of disallowance of the claim, or (ii) 180 days from when the claim was first filed, whichever is earlier. § 1821(d)(6)(A).  If a claimant fails to take such action within the 60-day period, "the claim shall be deemed to be disallowed . . ., such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such a claim." § 1821(d)(6)(B).  Section 1821(d)(13)(D) in turn states:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over--
>
> (i)     any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver . . .; or
>
> (ii)    any claim relating to any act or omission of such institution or the Corporation as receiver.

In other words, failure to comply with the claims process will remove jurisdiction.

The preclusion does not apply, however, because on the particular facts of this case, the court claim has been "continued."  An appeal over which we had jurisdiction was pending.  The FDIC sought a stay of definite duration in order to permit an administrative proceeding.  The FDIC did not respond to the administrative filing of the plaintiff, and the stay expired.  No further action was required by rule or order of this court to continue the appeal, and appellant did not move to dismiss the appeal.  The appellant therefore "continued" the appeal for purposes of § 1821(d)(6).

This conclusion is supported by the reasoning and holding of *Aguilar v. Fed. Deposit Ins. Corp.*, 63 F.3d 1059 (11th Cir. 1995).  In that case the Eleventh Circuit held that "*where the district court entered a stay of definite duration,* claimants need not take

affirmative action to 'continue' a suit that was filed before the appointment of the receiver: the suit goes on when the stay expires." *Id.* at 1062. The facts of *Aguilar* resemble those of this case. There, as here, after being appointed receiver to a bank in an ongoing action, the FDIC requested a stay until the plaintiffs had exhausted their administrative remedies. *Id.* at 1061. There, as here, a significant period of time (six months in *Aguilar*) elapsed after the expiration of the stay before the court held a status conference, at which point the FDIC moved to dismiss because the plaintiffs did not take some action to continue the case. *Id.* The Eleventh Circuit held that "[n]one of the plain language of section 1821(d)(6) requires an affirmative act in a case like this one; the statute does not say what a claimant must do to 'continue,' that is, to go on with, an action." *Id.* at 1062. Therefore, once the court-ordered stay expires, the action continues.

As the Eleventh Circuit pointed out, this interpretation of § 1821(d)(6) "is consistent with the purpose of FIRREA—quick and efficient processing of claims[:]"

> [Although] Congress was clear in providing the FDIC with the opportunity to settle claims on its own before federal judicial intervention . . . nothing in the statute explicitly provides the FDIC with the additional benefit of requiring a claimant to take additional affirmative steps to let the FDIC and the federal court know the claimant is serious about it preexisting (but temporarily suspended) lawsuit[.] *Id.*

Our holding in this regard is based on the facts that there was an appeal from a final judgment pending when the receiver was appointed, and the receiver filed and was granted a motion for a stay of definite duration, which then expired without further action by the receiver on the administrative claim. To hold that under such a situation a further affirmative action is required for the action to continue does not make 12 U.S.C. § 1821(d)(6) a "dead letter," as contended by the district court in *First Union Nat'l Bank of Fla. v. Royal Trust Tower, Ltd.*, 827 F.Supp. 1564, 1567 (S.D. Fla. 1993), but rather declines to place an additional burden on a claimant who has admirably followed the claims process in the face of inaction by the receiver. We take no position on the different situations presented in cases relied upon by the FDIC with regard to the meaning of "continue" as applied to district court proceedings. In *Hanson v. Fed. Deposit Ins. Corp.*, 113 F.3d 866 (8th Cir. 1997), there was further action by the receiver

after the expiration of the stay; the FDIC sent Hanson a letter denying his claims and warning him that he would need to continue his action within the next 60 days.  *See id.* at 868.  In *Lakeshore Realty Nominee Trust v. Fed. Deposit Ins. Corp.*, No. 91-55-B, 1994 WL 262913 (D.N.H. May 25, 1994), the claimant appears to have initiated the stay, and to have repeatedly claimed that the stay should be continued, so that he had the responsibility to take action to lift it.

## VIII.

The judgment of the district court with respect to the contract claim regarding the payoff statement fee is reversed and remanded for further consideration in light of this opinion.  In all other respects the judgment of the district court is affirmed.