[No. B236455. Second Dist., Div. Four. Apr. 4, 2013.]

LEVON AKOPYAN et al., Plaintiffs and Appellants, v.
WELLS FARGO HOME MORTGAGE, INC., Defendant and Respondent.

[No. B236456. Second Dist., Div. Four. Apr. 4, 2013.]

NASSER JAWHER et al., Plaintiffs and Appellants, v.
AURORA LOAN SERVICES, LLC., Defendant and Respondent.

122

128

---

---

**COUNSEL**

Kabateck Brown Kellner, Brian S. Kabateck, Richard L. Kellner, Evan M. Zucker; The Wentz Law Firm, Richard B. Wentz, Jean M. Wentz; Cohen Milstein Sellers & Toll, Andrew N. Friedman, Douglas J. McNamara and Stefanie M. Ramirez for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton, Michael J. Steiner, Sunny S. Huo and Erik Kemp for Defendants and Respondents.

OPINION

**EPSTEIN, P. J.**—These consolidated appeals, each from a judgment of dismissal of a class action complaint after a sustained demurrer, raise two questions. The first is whether the limitation on late payment charges in Business and Professions Code section 10242.5, subdivision (b)[1] applies to home mortgage loans negotiated by mortgage loan brokers, regardless of the exempt status under section 10133.1 of entities that funded and serviced the loans. We conclude the statutory limitation on late fees applies to these loans.

The second question is whether an action lies by appellant borrowers against the federally regulated entities that serviced the loans for breach of contract, on the theory that the payment application requirement in section 10242.5, subdivision (b) was implicitly incorporated into each loan by operation of law, and the servicers misapplied payments and charged late fees in violation of that implied term. We conclude that appellants' contract claims are preempted by the National Bank Act (12 U.S.C. § 1 et seq.) (NBA) and the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) (HOLA) respectively.

Both judgments are affirmed.

## FACTUAL AND PROCEDURAL SUMMARY

According to the operative first amended complaint in case No. B236455, appellants Levon and Tagouhi Akopyan entered into a home mortgage loan with Aames Funding Corporation in 2003. The note contained a late payment provision, allowing the holder to impose a late fee after a 10-day grace period and setting the late fee at 6 percent of the overdue payment. In 2005, appellant Armenui Karapogosyan entered into a home mortgage loan with WMC Mortgage Corporation. The note set a 15-day grace period for payments and a late fee of five percent for the overdue payment. Each of these notes permitted that late fees be applied only once to an overdue payment. The complaint alleges the loans were negotiated by a licensed mortgage loan broker.

At some point, Wells Fargo Home Mortgage, Inc.,[2] began servicing the loans. Payments were due on the first day of each month. The Akopyans did not make the payment due on December 1, 2007, and were assessed a late fee on December 17, 2007. The payment they made on December 31, 2007, was applied to the past due December installment, resulting in their failure to pay

---

[1] Unless otherwise specified, statutory references are to the Business and Professions Code.

[2] Respondent Wells Fargo Bank, N.A. (Wells Fargo), represented below that Wells Fargo Home Mortgage, Inc., was incorrectly named as a defendant since it is a division of the bank, not a separate entity. Appellants do not challenge this representation.

the January 2008 installment. They were assessed another late fee on January 16, 2008. Similarly, Karapogosyan, who did not make the payment due on March 1, 2007, but made a payment on March 30, 2007, was assessed late fees in both March and April 2007.

The complaint in case No. B236456 alleges that, in 2007, appellants Nasser Jawher and Miguel Martinez entered into home mortgage loans with American Home Equity Corporation and American Brokers Conduit respectively. The late payment provisions in their notes were similar to the provisions in Karapogosyan's note. The complaint also alleges these loans were negotiated by licensed mortgage brokers. At some point respondent Aurora Loan Services, LLC (Aurora), began servicing the loans. In 2008 and 2009, Jawher was assessed late fees eight times because his payments were applied to past due installments. In 2009, Martinez was charged three late fees for the same reason.

On all these loans, respondents applied appellants' payments to installments in the order they became due, resulting in successive late payments and fees. Appellants sued respondents for breach of contract on the theory that, since the loans were made in California, each incorporated the requirement in section 10242.5, subdivision (b), that a payment made within 10 days of the due date of an installment must be applied to that installment. By applying payments made within 10 days of scheduled installments to past due installments, respondents allegedly breached the terms of the loans they serviced. The complaints also included causes of action for unfair business practices under the unfair competition law (§ 17200 et seq.), for unjust enrichment, and for declaratory relief.

The trial court sustained respondents' demurrers on two alternative grounds: that section 10133.1 exempted Wells Fargo and Aurora from section 10242.5, and that the breach of contract claims were preempted by federal law. The court ruled that the unfair business practices claims and the requests for declaratory relief failed for the same reasons. The court also ruled that the existence of an express contract precluded relief for unjust enrichment. Both cases were dismissed.

We consolidated the timely appeals.

## DISCUSSION

### I

We review de novo the judgment (order of dismissal) entered after a demurrer is sustained to determine whether the complaint alleges facts

sufficient to state a cause of action on any legal theory. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42 [105 Cal.Rptr.3d 181, 224 P.3d 920].) We assume well-pleaded factual allegations to be true, but also consider matters that properly have been judicially noticed. (*Ibid.*)

Appellants' breach of contract claims are based on the theory that section 10242.5 was incorporated in the loans by operation of law. The trial court ruled that section does not apply to the loans because Wells Fargo and Aurora are exempt under section 10133.1. It did not reach respondents' alternative argument that section 10133.1 also exempts the lenders that initially funded the loans. We agree with appellants that, while section 10133.1 exempts certain entities from the licensing requirements applicable to mortgage loan brokers, it does not exempt loans negotiated by brokers with exempt entities.

A. *The Statutory Scheme*

■ To determine the legislative intent of statutory provisions and effectuate their purpose, we examine their language " ' "with reference to the entire scheme of law of which [they are a] part so that the whole may be harmonized and retain effectiveness." ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].)

■ Sections 10133.1 and 10242.5 are among the licensing provisions in Business and Professions Code division 4, part 1, chapter 3, articles 1 and 7 (article 7), respectively, part of the Real Estate Law (§ 10000 et seq.). The purpose of the licensing requirements is to protect the public from incompetent or untrustworthy practitioners. (*All Points Traders, Inc. v. Barrington Associates* (1989) 211 Cal.App.3d 723, 729 [259 Cal.Rptr. 780].) To that end, all real estate brokers in California must be licensed. (§ 10130.) In relevant part, section 10131, subdivision (d) defines a real estate broker as a person who, for compensation or expectation of compensation, "[s]olicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity." These activities describe the business of a mortgage loan broker. (*Winnett v. Roberts* (1986) 179 Cal.App.3d 909, 919 [225 Cal.Rptr. 82], citing *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 [157 Cal.Rptr. 392, 598 P.2d 45].)

■ Loans made or negotiated by mortgage loan brokers are subject to article 7, section 10240 et seq. (§ 10248.3.) Most provisions of this article apply only to certain small residential mortgage loans, with a principal

amount less than $30,000 if secured by a first deed of trust or less than $20,000 if secured by a junior deed of trust. (§§ 10240.1, 10240.2, 10245.) A few provisions, including section 10242.5, apply to bona fide loans without a limitation on their principal amount. (§ 10245.) Section 10242.5 limits the charge for a late payment to 10 percent of the installment due or a minimum of $5, and provides for a 10-day grace period. It also provides that a late payment fee may be charged only once for the same late installment, and that a payment made within 10 days of a scheduled installment's due date must be applied to that installment. (§ 10242.5, subd. (a), (b).)

Section 10133.1, subdivision (a) exempts from section 10131, subdivision (d) and article 7 "(1) [a]ny person or employee thereof doing business under any law of this state, any other state, or the United States relating to banks, trust companies, savings and loan associations, industrial loan companies, pension trusts, credit unions, or insurance companies. [¶] . . . [¶] (6) Any person licensed as a finance lender when acting under the authority of that license. [¶] . . . [¶] (10) Any person licensed as a residential mortgage lender or servicer when acting under the authority of that license." Respondents argue that section 10133.1, subdivision (a)(1) makes article 7, including section 10242.5, inapplicable to them as banks, and that the original lenders also were exempt under subdivision (a)(6) and (10).[3]

■ Exceptions to the general provisions of a statute are narrowly construed and only apply to "those circumstances that are within the words and reason of the exception . . . . [Citation.]" (*Haas v. Meisner* (2002) 103 Cal.App.4th 580, 586 [126 Cal.Rptr.2d 843].) ■ Narrowly construed, section 10133.1, subdivision (a) excludes various entities from the definition of a mortgage loan broker in section 10131, subdivision (d), and therefore from the licensing requirements applicable to such brokers. Exempt entities do not need a real estate license to engage in the activities of a mortgage loan broker. (See §§ 10130, 10131, subd. (d), 10133.1, 10240, subd. (b).)

Since article 7 regulates loans made or negotiated by mortgage loan brokers, entities exempt under section 10133.1 are not subject to article 7 to the extent that they are outside the definition of a mortgage loan broker. But when a transaction involves both a mortgage loan broker and an exempt entity, excluding the entire transaction from article 7 would effectively relieve the mortgage loan broker from the requirements of that article as well. We are

---

[3] The trial court took judicial notice that the loans were initially funded by licensed mortgage bankers or finance lenders.

not persuaded the Legislature intended to categorically exclude broker-negotiated loans with exempt lenders from article 7 and thus impliedly exempt brokers from the requirements of that article.[4]

■ Rather, article 7 itself provides that its requirements variously apply to broker-negotiated loans depending on the type of collateral and principal amount. (§§ 10240.1, 10240.2, 10245.) Thus, the home loans at issue in this case (for amounts ranging from over $300,000 to over $500,000) are partially exempt from article 7 by virtue of section 10245, not section 10133.1. But they are not exempt from the late fee limitations of section 10242.5 since the Legislature has stated that section applies to broker-negotiated loans regardless of their amount. (§ 10245.)

### B. Statutory History

Although they do not purport to rely on legislative history on appeal, respondents nevertheless contend that article 7 was intended to apply to a different kind of loans than those at issue in this case. Specifically, respondents contend article 7 was intended to apply to loans made by mortgage loan brokers themselves or negotiated by them with nonexempt lenders, such as private individuals, because such loans were in high demand in the 1950's and much of the next three decades. Respondents conclude that article 7's "singular application remains unchanged" even though such loans may be less prevalent today. Respondents are incorrect.

The real estate loan statute of 1955, Civil Code former sections 3081.1 to 3081.93, was intended to stop the collection of excessive brokerage fees and other undesirable practices by mortgage loan brokers. (*Sedia v. Elkins* (1962) 201 Cal.App.2d 440, 449 [20 Cal.Rptr. 278].) In 1961, parts of the statute were added to the Real Estate Law, as article 7, section 10240 et seq., at the same time as the exemption now included in section 10133.1, subdivision (a)(1). Between 1961 and 1992, former section 10240, which requires mortgage loan brokers to make certain disclosures to borrowers, excluded

---

[4] At oral argument, respondents argued that *Moore v. Hill* (2010) 188 Cal.App.4th 1267 [116 Cal.Rptr.3d 140] (*Moore*) should guide our interpretation of the exemption in section 10133.1. The *Moore* court construed the constitutional usury exemption, which applies in relevant part to " 'any other class of persons authorized by statute.' " (*Moore*, at p. 1280, italics omitted, quoting Cal. Const., art. XV, § 1.) The court reasoned that the statutory class-based exemptions enacted pursuant to this constitutional provision exempt all class-member transactions from the usury law. (*Moore*, at p. 1282, fn. 13; see, e.g., Fin. Code, § 22002 [expressly creating a class of exempt persons pursuant to § 1 of art. XV of the Cal. Const.].) *Moore* would be relevant if section 10133.1 were a usury exemption, but it is not. It is a licensing exemption. (See *Del Mar v. Caspe* (1990) 222 Cal.App.3d 1316, 1331–1332 [272 Cal.Rptr. 446] [exemptions in § 10133.1 are from broker licensing law, not from usury law]; 13A Cal.Jur.3d (2004) Consumer and Borrower Protection Laws, § 635 [listing usury exemptions].)

from this disclosure requirement broker-negotiated loans for lenders exempt under section 10133.1, subdivision (a), but only if the commission the broker charged the borrower was 2 percent or less. (See Legis. Com. com., Deering's Ann. Bus. & Prof. Code (2007 ed.) foll. §§ 10133.1, 10240, pp. 86, 271; Stats. 1961, ch. 886, §§ 11, 24, pp. 2326, 2337, 2338.) This exclusion indicates that, when the Legislature intended to relieve mortgage loan brokers of certain requirements in transactions with exempt lenders, it did so expressly. It also shows that article 7 was intended to reach undesirable practices by mortgage loan brokers in transactions with exempt lenders.[5]

Added to article 7 in 1973, section 10242.5 appears to be the first statutory limitation on late fees in California. (See generally Note, *Late-Payment Charges: Meeting the Requirements of Liquidated Damages* (1975) 27 Stan. L.Rev. 1133 (hereafter Note).) At the time, former section 10245 limited the application of article 7 to loans in amounts up to $16,000 on first deeds of trust, and $8,000 on second deeds of trust. (Note, at p. 1144.) There is no indication that broker-negotiated loans in these amounts were meant to be excluded from section 10242.5 if the lender that made them was exempt under section 10133.1.

Late fees charged on broker-negotiated loans were a recognized problem in 1973, and so were late fees charged by lenders exempt under section 10133.1. (See *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 735 [108 Cal.Rptr. 845, 511 P.2d 1197] [savings and loan association charged late fee as percentage of remaining principal]; *Clermont v. Secured Investment Corp.* (1972) 25 Cal.App.3d 766, 768 [102 Cal.Rptr. 340] [lender charged late fee equal to 1 percent of original amount of note on broker-negotiated loans]; see generally Note, *supra*, 27 Stan. L.Rev. at p. 1133, fn. 2.)

The late fee limitation on loans for single-family owner-occupied dwellings in Civil Code section 2954.4 was added in 1975. (See Legis. Com. com., Deering's Ann. Civ. Code (2007 ed.) foll. § 2954.4, p. 542.) It explicitly excludes loans made or negotiated by a mortgage loan broker subject to article 7. (Civ. Code, § 2954.4, subd. (e).) Then, in 1989, the Legislature exempted section 10242.5 from the loan amount limitation in section 10245. (See Legis. Com. com., Deering's Ann. Bus. & Prof. Code (2007 ed.) foll.

---

[5] A 1971 report by the Senate Subcommittee on Human Needs and Resources described one mortgage loan broker's discipline for convincing borrowers to refinance loans and charging them 10 percent commissions on loans obtained from savings and loans associations. (See Sen. Subcommittee on Human Needs and Resources, Who Protects the Necessitous Borrowers? Mortgage Loan Brokers, Necessitous Borrowers, and the Operation of the California Mortgage Loan Brokers Law (1955–69) (Feb. 15, 1971), rep. by Leo Bromwich, p. 25.) The report illustrates the need to protect borrowers from mortgage loan brokers' practice of charging exorbitant commissions on loans obtained from savings and loan associations, even though the associations themselves were exempt under section 10133.1, subdivision (a)(1).

§ 10245, p. 284.) Thus, the relative scope of the late fee provisions in Civil Code section 2954.4 and Business and Professions Code section 10242.5 changed over the years.

This statutory history does not support respondents' assumption that article 7 was intended to cover mortgage loan broker transactions involving only nonexempt lenders or that its application has remained unchanged. Rather, it shows that the Legislature controls the application of article 7 to transactions involving mortgage loan brokers from within, not from without, that article.

Accepting as true the allegations in the complaints that the loans were negotiated by licensed mortgage loan brokers, we conclude they are subject to the late fee limitations of section 10242.5.

### C. *Implied Incorporation*

■ Appellants' breach of contract claims are premised on the general rule that " ' "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' [Citation.]" (*Swenson v. File* (1970) 3 Cal.3d 389, 393 [90 Cal.Rptr. 580, 475 P.2d 852].) For the first time on appeal, respondents argue this rule may not be applied to vary the express terms of a contract. They point out that the deeds of trust, attached to the complaints and incorporated by reference, all provide that "payments shall be applied to each Periodic Payment in the order in which it became due." This provision is contrary to section 10242.5, subdivision (b), which states in relevant part that "a payment or tender of payment made within 10 days of a scheduled installment due date shall be deemed to have been made or tendered for payment of that installment."

■ Respondents' assumption that express contract terms may not be varied by operation of law is not correct. "[A] law established for a public reason cannot be contravened by a private agreement." (Civ. Code, § 3513.) A contractual provision that contravenes public policy is illegal and either void or unenforceable. (*Swenson v. File, supra,* 3 Cal.3d at pp. 393–394 [limiting enforcement of express noncompete clause to extent allowed by statute]; see Civ. Code, § 1667 [defining as unlawful contracts that are contrary to "an express provision of law" or to "the policy of express law, though not expressly prohibited"].) Instead, the statutory terms " 'become a part of the contract with full binding effect upon each party.' " (*Interinsurance Exchange v. Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 148 [23 Cal.Rptr. 592, 373 P.2d 640] [invalidating contractual exclusionary provision and applying statutory coverage to automobile liability insurance policy].)

■ Public policy may be expressed in a statute or implied from its language. (*Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 132 [99 Cal.Rptr.2d 417].) The Real Estate Law, of which article 7 is part, was designed to protect the consuming public in real estate transactions, as was article 7 itself. (*Montoya v. McLeod* (1985) 176 Cal.App.3d 57, 63 [221 Cal.Rptr. 353]; *Realty Projects, Inc. v. Smith* (1973) 32 Cal.App.3d 204, 211, fn. 11 [108 Cal.Rptr. 71].) Section 10248.1 of article 7 expressly prohibits a mortgage loan broker from negotiating late fees other than those specified in section 10242.5. Borrowers may recover excessive charges from the person who took or received them and are entitled to treble damages except in cases of bona fide error. (§ 10246.) Or they may proceed against the broker. (§ 10248.2.) Their rights and remedies under article 7 are not waivable. (§ 10248.2, subd. (a).) Because they are established for a public purpose, the limitations on late fees in section 10242.5 may not be contravened by private agreement. ·

We conclude that the payment application requirement of section 10242.5 may be implied in the loans despite the loans' express terms. We consider next whether appellants' breach of contract claims, based on the implied incorporation of this requirement, are preempted by federal law.

II

The trial court ruled that appellants' breach of contract claim against Wells Fargo[6] was preempted by the NBA and its implementing regulations, and that the same claim against Aurora[7] was preempted under the HOLA and its regulations. Appellants rely on the savings clauses in two preemption regulations, regarding real estate lending by national banks and federal savings associations. (12 C.F.R. §§ 34.4(b)(1) (2009), 560.2(c) (1997).)[8] The differences between the two regulatory schemes bear on the preemption analysis, if not on the result, and we therefore discuss preemption under the NBA and the

---

[6] The trial court took judicial notice of official records establishing Wells Fargo's status as a national bank. These records are not included in appellants' appendix in case No. B236455, but the bank's status is not contested.

[7] The trial court also took judicial notice of official records establishing that Aurora Loan Services, LLC, is an operating subsidiary of Aurora Bank, FSB. State law applies to operating subsidiaries to the same extent it applies to federal savings associations. (12 C.F.R. § 559.3(n)(1) (2013).)

[8] Under the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) (Pub.L. No. 111-203 (July 21, 2010) 124 Stat. 1376), effective July 21, 2011, 12 Code of Federal Regulations part 34.4 was amended (76 Fed.Reg. 43549, 43558 (July 21, 2011)) and part 560.2 was superseded (76 Fed.Reg. 48950, 48952 (Aug. 9, 2011)). These amendments to HOLA and NBA preemption are prospective. (See *Brown v. Wells Fargo Bank, N.A.* (D.D.C. 2012) 869 F.Supp.2d 51, 56, fn. 5, citing 12 U.S.C. § 1465(a), (b).) They do not affect our discussion of the preamendment language of the regulations.

HOLA separately. After considering the parties' supplemental briefs on the issue, we conclude that federal law preempts appellants' breach of contract claims.

It is common for servicing rights to be transferred or sold independently of the loan itself, and for the mortgage loan servicer to be an entity separate from the loan originator, lender, or owner. "When a loan is secured by a mortgage, the borrower may be asked to sign various transfer agreements that allow the mortgagee to assign not only the mortgage itself but also or instead various rights that the mortgage grants the mortgagee, such as the rights to collect monthly payments from the mortgagor, collect late payments from him, foreclose in the event of default, or place the mortgagor's payments for taxes and insurance premiums in escrow. The administration of these rights is called 'servicing' the mortgage. If the firm doing the servicing . . . exceeds its rights under the transfer agreements, the mortgagor's recourse is against that firm rather than against the original mortgagee or the current holder of the mortgage." (*In re Ocwen Loan Servicing, LLC* (7th Cir. 2007) 491 F.3d 638, 641 (*Ocwen*).

According to the loan documents in this case, periodic payments, as well as late fee payments, are to be made to the note holder or lender. The deeds of trust notify the borrowers that the notes or partial interests in them may be sold, and the servicing rights may be transferred along with or independently of the sale of the notes. The complaints allege that Wells Fargo and Aurora "were assigned contractual loan servicing obligations" on loans by state lenders, or that they service the loans as agents of the loan owners. The servicers are responsible for collecting loan payments, allocating them, and accounting for them to the borrowers and the note holders. The late fees assessed and collected on the loans are for the servicers' own benefit and retained by them.[9]

Our preemption analysis is premised on the allegations in the complaints that respondents were assigned servicing rights to third party loans originated under state law, including the right to assess and collect late payment fees for the servicers' own benefit.

A. *Preemption Generally*

The supremacy clause of the United States Constitution requires courts to follow federal rather than state law if, in enacting a federal statute,

---

[9] The complaints do not specifically allege whether the loans themselves were sold, but in supplemental briefing, appellants represent that they were sold on the secondary market or securitized. Respondents do not challenge this representation.

Congress intended to set aside state law. (*Parks v. MBNA America Bank, N.A.* (2012) 54 Cal.4th 376, 382 [142 Cal.Rptr.3d 837, 278 P.3d 1193] (*Parks*).) There are four kinds of federal preemption: (1) express preemption, where Congress explicitly identifies the extent to which federal law preempts state law; (2) field preemption, where the federal regulatory scheme is so pervasive as to leave no room for supplementary state regulation; (3) conflict preemption, where it is impossible to comply with both federal and state law; and (4) obstacle preemption, where state law frustrates the purpose of federal law. (*Id.* at p. 383.)

 Federal regulations have the same preemptive effect as the statutes under which they are promulgated, and the agency's reasonable construction of the statute it is charged with enforcing is entitled to deference. (*Aguayo v. U.S. Bank* (9th Cir. 2011) 653 F.3d 912, 919, 920.) The agency's interpretation of its own regulations controls unless it is plainly erroneous or inconsistent with the regulations. (*Long Island Care at Home, Ltd. v. Coke* (2007) 551 U.S. 158, 170–171 [168 L.Ed.2d 54, 127 S.Ct. 2339].)

### B. *HOLA Preemption*

Between 1933 and 1989, federal savings and loan associations (also referred to as thrift institutions or thrifts) were regulated under the HOLA by the Federal Home Loan Bank Board (FHLBB). (*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 613–614 [115 Cal.Rptr.2d 765].) The FHLBB was given "plenary authority to issue regulations governing" thrift institutions and superseding state law. (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 160, 162 [73 L.Ed.2d 664, 102 S.Ct. 3014].) Over the years, the FHLBB comprehensively regulated their operations, "including their lending practices and, specifically, the terms of loan instruments." (*Id.* at pp. 166–167 & fn. 20 [citing regulations on "fair credit requirements, the types and amount of loans, collateral required, repayment schedules, initial loan charges, assignment of rents, escrow accounts and interest paid on those accounts, late charges, *servicing of loans*, and loan payments and prepayments" (italics added)].) In addition, the FHLBB adopted a general regulation (12 C.F.R. § 545.2) preempting "any state law purporting to address the subject of the operations of a Federal association." (48 Fed.Reg. 23032, 23058 (May 23, 1983).)

In 1989, the FHLBB was replaced by the Office of Thrift Supervision (OTS), which was given the same plenary power to regulate federal savings associations. (*Washington Mutual Bank v. Superior Court, supra,* 95 Cal.App.4th at pp. 614–615, citing 12 U.S.C. § 1464(a).) In 1996, the OTS adopted its now superseded lending preemption regulation (12 C.F.R.

§ 560.2), which is at issue in this case.[10] (61 Fed.Reg. 50951, 50952 (Sept. 30, 1996).) In paragraph (a) of the regulation, the OTS announced its intent to preempt "the entire field of lending regulation for federal savings associations," in order to give them "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities . . . ." (12 C.F.R. § 560.2(a).) Illustrative examples of the types of state laws preempted by paragraph (a) were listed in paragraph (b). Included in the list were "state laws purporting to impose requirements regarding: [¶] . . . [¶] . . . [l]oan-related fees, including . . . late charges . . . ," as well as the "processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." (12 C.F.R. § 560.2(b)(5) & (10).) Paragraph (c) saved from preemption certain state laws, such as contract law, "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) . . . ." (12 C.F.R. § 560.2(c)(1).)

Because it occupied the field of lending regulation, the OTS presumed that preemption applies to state lending laws. "This presumption can be reversed only if the law can clearly be shown to fit within the confines of [the savings clause, 12 C.F.R. § 560.2(c)]. For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption." (61 Fed.Reg. 50951, 50966–50967 (Sept. 30, 1996).)

Appellants argue servicing third party loans is not lending under 12 Code of Federal Regulations part 560.2 (1997), and preemption does not apply unless the federal thrift made the loans it services. We consider these arguments next.

## 1. *Lending by Federal Savings Associations*

The HOLA authorizes federal savings associations to "invest in, sell, or otherwise deal in" residential property loans. (12 U.S.C. § 1464(c)(1)(B).) These "lending and investment powers . . . are intended to encourage such institutions to provide credit for housing safely and soundly." (12 U.S.C. § 1464(a).) The FHLBB authorized federal thrifts to "originate, invest in, sell, purchase, *service*, participate, or otherwise deal in (including brokerage or

---

[10] After the enactment of the Dodd-Frank Act in 2011, the OTS was merged into the Office of the Comptroller of the Currency (OCC), which regulates national banks under the NBA. Field preemption under the HOLA was eliminated, and the conflict preemption standards in *Barnett Bank of Marion Cty., N.A. v. Nelson* (1996) 517 U.S. 25 [134 L.Ed.2d 237, 116 S.Ct. 1103] (*Barnett Bank*) now apply to both federal savings associations and national banks. (*Brown v. Wells Fargo Bank, N.A., supra,* 869 F.Supp.2d at p. 56, fn. 5.)

warehousing) loans made on the security of residential or nonresidential real estate, or interests in such loans, subject to the limitations of [part 545]." (12 C.F.R. § 545.32(a); 48 Fed.Reg. 23032, 23060 (May 23, 1983), italics added.) The FHLBB considered servicing to be within a federal savings association's broad authority to invest in real estate loans. (48 Fed.Reg. 2340, 2342 (Jan. 19, 1983).)

 In an effort to streamline the lending regulations it inherited, in 1996 the OTS moved the activities authorized under 12 Code of Federal Regulations part 545.32(a) to 12 Code of Federal Regulations part 560.30. Under this part, federal savings associations "may make, invest in, purchase, sell, participate in, or otherwise deal in" home loans. (12 C.F.R. § 560.30.) Although the OTS did not include servicing among the "lending and investment powers" listed in part 560.30, its stated intent was not to eliminate any previously authorized activity. (61 Fed.Reg. 50951, 50954 (Sept. 30, 1996).) The authority of federal savings associations to sell securities, service pools of mortgage-backed securities issued by others, and issue such securities had been recognized by then. (See Murray & Hadaway, *Mortgage-backed Securities: An Investigation of Legal and Financial Issues* (1986) 11 J. Corp. L. 203, 211.)

To allow federal thrifts "greater flexibility in their lending and investment operations," the OTS deleted some lending regulations, replaced others with guidelines, and directed the thrifts to comply with the uniform interagency real estate lending standards set forth at 12 Code of Federal Regulations parts 560.100 and 560.101. (61 Fed.Reg. 50951, 50952, 50954 (Sept. 30, 1996).)[11] As relevant here, the interagency guidelines required that a savings association "establish loan administration procedures for its real estate portfolio," addressing such matters as financial statements and appraisals; loan closing and disbursement; payment processing; escrow and collateral administration; loan payoffs; collections and foreclosure; claims processing; and servicing and participation agreements. (Appen. to 12 C.F.R. § 560.101.) The reference to servicing agreements, a feature of third party loan servicing arrangements,[12] suggests that such arrangements fell within the scope of the interagency real estate lending standards that federal thrifts were directed to follow.

---

[11] These standards were adopted by the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, the OCC, and the OTS under the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. § 1828($o$).) (57 Fed.Reg. 62890 (Dec. 31, 1992).)

[12] See, e.g., Plank, *The True Sale of Loans and the Role of Recourse* (Winter 1991) 14 Geo. Mason U. L.Rev. 287, 295 ("If the owner of the loans does not want to service them, she will enter into a separate servicing agreement with a servicer specifying the duties of the servicer and the servicing fees. The servicing fees may be a percentage of the principal amount of the

■ This regulatory history leads us to conclude that all lending and investment powers of federal thrifts, including their right to service third party loans, are within the field of lending regulation occupied by the OTS.

In occupying the field, the OTS expressly intended to give federal thrifts "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation." (12 C.F.R. § 560.2(a) (1997).) Respondents argue that, since servicing is a lending power and state laws imposing requirements on it were included among the kinds of preempted state laws in paragraph (b) of the regulation, servicing may not be regulated by state law regardless of whether the federal savings association extended credit on the loans it services.

Appellants respond that the various types of state laws listed in paragraph (b) were preempted so that a federal savings association "may extend credit." (12 C.F.R. § 560.2(a) (1997).) They point to the OTS's conclusion in the final rule that, as a result of its own long-standing position on field preemption, as well as that of the FHLBB, federal savings associations "are free to originate loans under a single set of uniform federal laws and regulations." (61 Fed.Reg. 50951, 50955 (Sept. 30, 1996).) They note that the OTS repeatedly has found state laws to be preempted when applied to loans originated by federal thrifts. (See generally OTS, Opn. Letter No. P-2006-2 (Mar. 7, 2006) p. 2.) From this, appellants conclude that federal thrifts are not entitled to preemption unless they originate or fund the loans they service. This conclusion appears to be against the weight of authority.

■ The text of the preemption regulation indicates that it was meant to have more than one purpose. Paragraph (a) allows federal thrifts to exercise their lending powers in accordance with a uniform federal scheme of regulation and to extend credit as authorized by federal law. (12 C.F.R. § 560.2(a) (1997).) The savings clause, on which appellants rely, broadly focuses on the effect of state laws on the lending operations of federal thrifts, rather than narrowly on the extension of credit on a particular loan. (12 C.F.R. § 560.2(c) (1997).)

In directing how the preemption regulation is to be applied, the OTS did not limit its application to loans the federal thrift originated or funded. Instead, it presented the following approach: "When analyzing the status of

---

loan . . . or a dollar amount . . . and are paid out of the interest payments on the loan. The servicer may also be entitled to receive additional amounts, such as late fees paid by the underlying borrower and reimbursement for collection costs out of foreclosure proceeds or from the owner of the loan. Finally, the servicing agreement generally provides for the resignation by the servicer and the termination and replacement of the servicer if the servicer fails to perform adequately").

state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c)." (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).) This instruction has led courts to presume that state laws are preempted if, as applied, they regulate or affect any activity listed in paragraph (b). (See, e.g., *Silvas v. E\*Trade Mortgage Corp.* (9th Cir. 2008) 514 F.3d 1001, 1005–1006 [adopting OTS's approach]; *Casey v. F.D.I.C.* (8th Cir. 2009) 583 F.3d 586, 593–595 [same].)

In cases where the federal savings association is the lender, the issue of who originated or funded the loan may be moot. But in some of the cases cited by respondents, courts have found preemption where a loan originated by a state lender was immediately sold on the secondary market. (See, e.g., *Stolz v. OneWest Bank* (D.Or., Jan. 13, 2012, No. 03:11-cv-00762-HU) 2012 WL 135424 [origination by state lender inconsequential where loan transferred to federal savings association three days after refinancing]; *Quintero Family Trust v. OneWest Bank, F.S.B.* (S.D.Cal., June 25, 2010, No. 09-CV-1561-IEG (WVG)) 2010 WL 2618729 [loan assigned immediately to Mortgage Electronic Registration Systems, then two years later to federal savings association].)[13]

These cases illustrate some of the changes in mortgage lending brought about by widespread securitization since the 1980's. (See Engel & McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending* (May 2002) 80 Tex. L.Rev. 1255, 1275.) As a result, "thinly capitalized mortgage bankers and finance companies can originate loans for sale on the secondary market." (*Ibid.*) The fact that federal thrifts participate in that market has long been recognized, and their participation has been subject to federal regulation. (See, e.g., *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta, supra,* 458 U.S. at p. 155, fn. 10 ["The marketability of a mortgage in the secondary market is critical to a savings and loan, for it thereby can sell mortgages to obtain funds to make additional home loans."]; 48 Fed.Reg. 23032, 23040 (May 23, 1983) [confirming FHLBB's long-standing position that federal savings association may buy "only those loans that it may make"].) As we have explained, one of the purposes of the OTS preemption regulation was to allow federal thrifts to exercise their lending powers in accordance with a uniform federal scheme of

---

[13] Unpublished federal district court decisions are citable and may be persuasive authority. (*Aleman v. AirTouch Cellular* (2012) 209 Cal.App.4th 556, 576, fn. 8 [146 Cal.Rptr.3d 849].)

regulation. (12 C.F.R. § 560.2.(a) (1997).) The federal thrifts' participation in the secondary market as buyers, sellers, or investors is subject to federal regulation.

Based on this rationale, two federal circuit courts have applied preemption to federal thrifts servicing loans originated by other lenders. In *Ocwen, supra,* 491 F.3d 638, the Seventh Circuit used the examples of preempted state laws in paragraph (b) of the OTS's preemption regulation to decide "what federal S & Ls can do without regard to state laws." (491 F.3d at p. 642.) The court reasoned that paragraph (b) was coextensive with the OTS's "exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to customers, and setting standards for processing and servicing mortgages. [Citation.]" (491 F.3d at p. 643.) Among the state laws the court found to be preempted as to the federal servicer was the 10-day grace period for late fees in Civil Code section 2954.4, subdivision (a). (491 F.3d at pp. 645–646.)

The Sixth Circuit in *Molosky v. Washington Mutual, Inc.* (6th Cir. 2011) 664 F.3d 109 (*Molosky*) applied similar reasoning to hold state usury claims based on payoff statement and recording fees charged by the federal servicer were preempted, since laws regarding "loan-related fees" were among those listed in paragraph (b) of the preemption regulation. (664 F.3d at p. 113, citing 12 C.F.R. § 560.2(b)(5) (2011).) *Molosky* rejected the argument that preemption does not apply when a federal savings association services a loan it did not originate. (*Molosky, supra,* 664 F.3d at p. 114.) The court found decisive the fact that the allegedly illegal fees were charged after the loan was transferred, so that the effect of the state usury claim was to regulate the servicer's actions. (*Ibid.*)

■ We find *Ocwen* and *Molosky* persuasive and conclude that the OTS intended to occupy the field of lending regulation as to both federal thrifts and their loans.

## 2. *Breach of Contract*

Appellants proceed on the assumption that enforcement of contracts generally has only an incidental effect on the federal thrift lending operations, so that contract assignment principles survive preemption. This broad assumption is unjustified in light of the OTS's intent that the savings clause be read narrowly. (61 Fed.Reg. 50951, 50967 (Sept. 30, 1996).)

■ Contract law is among the state laws listed in the savings clause, but the OTS exempted it from preemption only so long as its effect on the

lending operations of federal savings associations is incidental or otherwise consistent with the purposes of paragraph (a) of the regulation. (12 C.F.R. § 560.2(c)(1).) The purpose of the savings clause was "to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).) Thus, the savings clause was not intended to apply to " 'state laws that may be designed to look like traditional property, contract, tort, or commercial laws, but in reality are aimed at other objectives, such as regulating the relationship between lenders and borrowers, protecting the safety and soundness of lenders, or pursuing other state policy objectives.' [Citation.]" (*Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1303 [128 Cal.Rptr.2d 19] (*Gibson*), quoting 61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).)

Appellants contend their breach of contract claim is based on two generally applicable principles of state contract law: that applicable laws in existence when an agreement is made become part of the agreement (*Swenson v. File, supra,* 3 Cal.3d at p. 393), and that an assignee stands in the shoes of the assignor. (*Cadlerock Joint Venture, L.P. v. Lobel* (2012) 206 Cal.App.4th 1531, 1546 [143 Cal.Rptr.3d 96].) Under the first principle, the limitation on late fees in section 10242.5 became a term of the loan agreements with the state lenders by operation of state law. Under the second, Aurora stands in the shoes of the state lenders if it acquired its servicing rights by assignment from them. The question is whether the implied incorporation of the state statutory limitation on late fees into the state-originated loans based on state public policy survives preemption under the HOLA when it is applied to the assignee federal thrift servicing the loans.

### a. The "As Applied" Approach

In determining whether a claim based on a state law of general application is saved from preemption under the HOLA, the OTS employed, and courts have followed, an "as applied" approach. They consider whether the state law, as applied, imposes specific requirements on any activities listed in paragraph (b) of the preemption regulation. (See generally *Casey v. F.D.I.C., supra,* 583 F.3d at pp. 593–594.) For example, in *Ocwen, supra,* 491 F.3d 638, the Seventh Circuit reasoned that the assertion by the OTS of its "plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." (*Id.* at p. 643.) The court distinguished claims that fall "on the regulatory side of the ledger" from those that fall on the common law side, concluding that basic fraud and breach of contract claims are not preempted. (*Id.* at pp. 644–645.)

The class action complaint in *Ocwen* was so poorly drafted that the court found it "difficult and in many instances impossible to ascertain the nature of the charges." (*Ocwen, supra,* 491 F.3d at p. 641.) The breach of contract was based in part on allegations that " 'plaintiffs satisfied their obligations by making timely payments of principal and interest on their loans,' but that nevertheless 'by charging late fees on payments that were not late, Ocwen breached its contracts with Plaintiffs and the Class.' . . ." (*Id.* at p. 645.) The *Ocwen* court stated that these "seem like conventional breach of contract allegations" and allowed the breach of contract claim to proceed on the ground that the federal servicer was a partial assignee of the rights created by the mortgage contracts. The court reasoned that holding a partial assignee responsible for breach of contract "is no different than if the original mortgagee, or an assignee of the entire mortgage, had violated the terms of the mortgage . . . . If an original mortgagee can be sued under state law for breach of contract, so may the partial assignee if he violates the terms of the part of the mortgage contract that has been assigned to him." (*Ibid.*)

Appellants rely on *Ocwen* to argue that their breach of contract claim should not be preempted. This reliance is misplaced. There is no indication that the *Ocwen* court understood the breach of contract claim before it to be based on an implied by law term, rather than an express term, of the loan agreements. The court noted that the complaint was unclear whether the alleged "unauthorized charges" were "unauthorized by the loan agreements or forbidden by state law." (*Ocwen, supra,* 491 F.3d at p. 645.) It also suggested that a state may not be able to limit the rights that an assignment confers on the servicer. (*Ibid.*)

Under *Ocwen*, appellants' breach of contract claim falls on the regulatory side of the ledger since appellants seek to hold Aurora liable for charges expressly authorized by the loan documents, but forbidden under state law. Under appellants' theory, the express right to apply a payment to the oldest outstanding installment due could not have been assigned to Aurora because a statutory payment application requirement was implied into the loans under state law. (See *Swenson v. File, supra,* 3 Cal.3d at pp. 393–394.) *Ocwen* suggests that this limitation on the servicer's assigned rights would be subject to preemption.

b. *The "State-imposed Requirement" Approach*

 In determining whether a breach of contract claim is saved from preemption under the HOLA, some courts have drawn a distinction between state-imposed and voluntarily undertaken obligations. The distinction was originally drawn in *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*), where a plurality of the court

reasoned that "a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement . . . *imposed under State law* . . .' (fn. omitted.)" for purposes of preemption under the Public Health Cigarette Smoking Act of 1969 (15 U.S.C. § 1331 et seq.). (*Cipollone*, at p. 526.) In *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219 [130 L.Ed.2d 715, 115 S.Ct. 817] (*Wolens*), a majority of the court followed *Cipollone* in holding that the Airline Deregulation Act of 1978 (49 U.S.C. § 40101 et seq.) prevented states from imposing their own substantive standards on airlines, but did not preempt "routine" breach of contract claims based on an airline's dishonoring its voluntarily undertaken obligations. (*Wolens*, at pp. 229, 232.) The *Wolens* court noted that the distinction between state-imposed and self-imposed obligations "confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." (*Id.* at p. 233, fn. omitted.)

Relying on *Cipollone, supra*, 505 U.S. 504, the court in *Gibson, supra*, 103 Cal.App.4th 1291, reasoned that HOLA preemption did not apply to contractual duties voluntarily assumed by a federal savings association since such duties were not "designed to regulate federal savings associations more than any other type of business," and did not "have a disproportionate impact on lending institutions." (*Gibson*, at p. 1302.) The court declined to apply preemption to claims that a federal savings association engaged in unfair business practices when it charged higher insurance premiums than necessary to protect its security under the express terms of the deeds of trust. (*Id.* at p. 1301.)

In *Molosky, supra*, 664 F.3d 109, the state-originated mortgage loan contained an express provision allowing the borrowers to prepay without being charged a prepayment fee. (*Id.* at p. 114.) Following *Ocwen, supra*, 491 F.3d 638, *Molosky* concluded that holding the federal servicer to this express term loan would be consistent with the OTS's preemption regulation. (*Id.* at p. 115.) It noted, in dictum, that "permitting breach of contract claims may not be consistent with the purposes of HOLA . . . when state contract law interposes unstated or implied terms into a contract." (*Ibid.*, citing *Wolens, supra*, 513 U.S. at p. 233 & fn. 8.)

Appellants argue *Molosky* failed to appreciate that the approach to preemption adopted in *Wolens* has been applied only to the federally regulated entities' own contracts. As we explain in our discussion of NBA preemption, the distinction between state-imposed and self-imposed obligations has been applied more broadly than appellants allow. Regardless, to the extent *Wolens* and *Molosky* suggest that a breach of contract claim may not be used to impose state substantive standards on federal thrifts, their suggestion is consistent with the "as applied" approach to preemption.

██ Appellants do not allege a routine breach of contract claim that purports to enforce their basic contract rights under the express terms of the loan agreements. Instead, the effect of implying a state substantive standard on late fees in the loans serviced by Aurora is to limit its ability to service the loans according to their express terms and to require that it service them in accordance with the specific state statute that applies to the loans. If this case is any indication, such a claim exposes the federal thrift to the additional expense of litigating which state statutes apply to particular loans, as well as to liability under a variety of state laws specifically regulating loan-related fees. Its effect is thus not to enforce a contractual obligation, but "to open the door to state regulation" of federal thrifts. In its final rule, the OTS expressly warned against the use of the savings clause to such an end. (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).)[14]

The additional effect of varying the express terms of the loans is to limit Aurora's ability to collect late fees to which, appellants allege, it is entitled for its own benefit. The OTS has a separate late fee regulation, which provides: "A Federal savings association may include in a home loan contract a provision authorizing the imposition of a late charge with respect to the payment of any delinquent periodic payment. With respect to any loan made after July 31, 1976, on the security of a home occupied or to be occupied by the borrower, no late charge, regardless of form, shall be assessed or collected by a Federal savings association, unless any billing, coupon, or notice the Federal savings association may provide regarding installment payments due on the loan discloses the date after which the charge may be assessed. A Federal savings association may not impose a late charge more than one time for late payment of the same installment, and *any installment payment made by the borrower shall be applied to the longest outstanding installment due.* A Federal savings association shall not assess a late charge as to any payment received by it within fifteen days after the due date of such payment. No form of such late charge permitted by this paragraph shall be considered as interest to the Federal savings association and the Federal savings association shall not deduct late charges from the regular periodic installment payments on the loan, but must collect them as such from the borrower." (12 C.F.R. § 560.33 (2013), italics added.)

██ The payment application provision in the OTS's late fee regulation directly conflicts with section 10242.5, subdivision (b), which requires that payments be applied not in the order installments come due, but to the closest

---

[14] *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489–1490 [49 Cal.Rptr.3d 227], which appellants cite, is distinguishable because the breach of contract claim in that case was based on the implied incorporation in a loan agreement of the Real Estate Settlement Procedures Act of 1975 (RESPA; 12 U.S.C. § 2601 et seq.). As the court recognized, RESPA, a federal statute, is not subject to preemption. (142 Cal.App.4th at p. 1486.)

scheduled installment. Appellants argue that, since the OTS expressly authorized federal thrifts to "make home loans subject to" this late fee regulation (see 12 C.F.R. § 560.30, fn. 10 (2013)), the entire regulation applies to loans made by federal thrifts. But it does not necessarily follow that the OTS late fee regulation applies only to such loans. The regulation prescribes general standards for the assessment and collection of late fees by federal thrifts. (12 C.F.R. § 560.33 (2013).) As alleged here, Aurora assesses and collects late fees for its own benefit. Applying this provision to Aurora under the circumstances is consistent with the OTS intent that federal thrifts be subject to uniform federal regulation.

### c. Statutory Assignee Liability

Although they do not proceed under a statute providing for assignee liability, appellants rely on the administrative and judicial interpretations of such statutes to argue that the terms of state-originated loans should not change by virtue of their assignment to a federal servicer. The authorities appellants cite for this proposition do not support the imposition of broad assignee liability under the HOLA and are inapplicable to the breach of contract claim before us.

In reviewing the assignee liability provisions of the New Jersey predatory lending law (N.J. Stat. Ann. § 46:10B-22 et seq.), the OTS extended preemption to federally originated loans sold or assigned to investors not entitled to preemption on the principle that "loan terms should not change simply because an originator entitled to federal preemption may sell or assign a loan to an investor that is not entitled to federal preemption." (OTS, Opn. Letter No. P-2003-5 (July 22, 2003) p. 7, fn. 18.) Its rationale was that state law "might interfere with the ability of federal savings associations to sell mortgages that they originate under a uniform federal system." (*Ibid.*)

Appellants argue the principle that loan terms should not change applies equally when a state-originated loan is assigned to a federal thrift. But the rationale for applying preemption to the assignees of federal thrifts is to allow the thrifts themselves greater freedom from state interference. Extending assignee liability to federal thrifts on state-originated loans would have the opposite effect and would run afoul of the OTS stated purpose in the preemption regulation—to allow federal thrifts to exercise their lending powers under a uniform system of federal regulation.

Appellants suggest the OTS has endorsed subjecting federal thrifts to assignee liability on loans originated by state lenders. They quote out of context part of the OTS's interpretation of one particular assignee liability provision (N.J. Stat. Ann. § 46:10B-27.a), which is limited to sales of

manufactured homes or home improvements to borrowers. The OTS stated that, if this provision "were narrowly construed simply to subject federal savings associations purchasing or taking assignments of loans originated by creditors other than federal savings associations to the same claims and defenses applicable to the originating creditors, we would not be inclined to opine about federal preemption of the provision." (OTS, Opn. Letter No. P-2003-5 (July 22, 2003) p. 4, fn. 6.) The OTS explained that it relied on the Federal Trade Commission (FTC) holder rule (16 C.F.R. § 433.2 (2013)), which allows for assignee liability in consumer credit contracts for goods and services. (OTS, Opn. Letter No. P-2003-5 (July 22, 2003) p. 5, fn. 14.) The case before us does not involve consumer credit contracts for goods and services that would bring it within the scope of the FTC rule.

Some courts have declined to hold that the HOLA preempts assignee liability on state predatory loans. For instance, in *In re Thomas* (Bankr. D.Mass. 2011) 447 B.R. 402, the bankruptcy court held that "[i]f a non-federal thrift lender could 'cleanse' a predatory loan by selling it to a federal thrift, a vital component of many states' consumer protection regimes would be undermined. The OTS could not have intended this result when it promulgated its preemption regulation." (*Id.* at p. 407.)[15] There are no allegations that the loans are predatory high cost loans or that they are subject to California's antipredatory lending law, which, incidentally, excludes assignee liability. (See generally Carlson, *To Assign, or Not to Assign: Rethinking Assignee Liability as a Solution to the Subprime Mortgage Crisis* (2008) 2008 Colum. Bus. L.Rev. 1021, 1036, 1059, citing Fin. Code, § 4979.8.) Thus, cases involving statutory assignee liability on loans subject to other states' predatory lending laws are inapposite, whether or not they are correctly decided. We see no reason to extend their holdings to appellants' breach of contract claim in this case.

d. *Pre-1996 Authority*

Appellants' breach of contract theory is modeled on *Wisconsin League of Financial Institutions, Ltd. v. Sherry* (W.D.Wis. 1991) 761 F.Supp. 636 (*Sherry*). The question there was whether state savings institutions that had become federally chartered must continue to meet their preexisting obligations of paying interest on escrow mortgage funds. (*Id.* at p. 637.) The court

---

[15] But see *In re Thomas* (Bankr. D.Mass. 2012) 476 B.R. 691, 698 (HOLA preemption applied after federal thrift showed it advanced funds on loan at time of assignment); see also *Wong v. Bann-Cor Mortg.* (W.D.Mo., June 9, 2011, No. 10-1038-CV-W-FJG) 2011 WL 2314198 (HOLA does not preempt assignee liability claims under Missouri Second Mortgage Loan Act on high cost second mortgage loans federal thrift did not originate); *Gilmor v. Preferred Credit Corp.* (W.D.Mo., Jan. 13, 2011, No. 10-0189-CV-W-ODS) 2011 WL 111238 (same).

did not apply preemption to a breach of contract claim, which was based on the implied incorporation into mortgage loans of an otherwise preempted Wisconsin statute, which required that interest be paid on escrow accounts. (*Id.* at p. 639.) The court relied on the OTS position that, when institutions converted from a state to a federal charter, state law determined their continuing obligation on preexisting loans. (*Id.* at pp. 638–639.)

*Sherry* is inapposite because it was decided under the OTS regulations governing the conversion of state chartered institutions to federal charter. The institutions subject to the holding in *Sherry* were parties to the original loans and had preexisting obligations under them. In contrast, here, there is no claim that Aurora was a party to the state-originated loans. Rather, it is alleged to have received servicing rights by assignment, presumably under a servicing agreement, which is not before us. The question under these circumstances is not whether Aurora has a continuing obligation under the state-originated loans, but whether its assigned servicing rights under the loans' express terms can be limited by operation of state law. *Sherry* does not answer that question.

The OTS opinion letter issued in the same year does not aid appellants because it does not deal with preemption. Its sole concern was the retroactive effect on preexisting loans of the repeal of a federal regulation that required payment of interest on escrow accounts. The letter cited *Sherry, supra*, 761 F.Supp. 636, in that context. (OTS, Opn. Letter, Interest on Escrow Accounts (Dec. 31, 1991).)

Retroactivity also was the issue in *Viereck v. Peoples Savings & Loan Assn.* (Minn. 1984) 343 N.W.2d 30 (*Viereck*), another case on which appellants rely. *Viereck*'s holding was limited to state-originated mortgages held by federal savings associations before the effective date of the Garn-St. Germain Depository Institutions Act of 1982 (12 U.S.C. § 1701j-3), which preempted all state restrictions on the ability of lenders, assignees, and transferees to enforce due-on-sale clauses, subject to a certain window period. (See 4 Witkin, Summary of Cal. Law (10th ed. 2005) Security Transactions in Real Property, § 90, p. 881.) In that context, the court in *Viereck* reasoned that "state-chartered institutions may [not] circumvent state law restrictions on due-on-sale clauses by selling *old* mortgages to federal savings and loans or by acquiring a federal charter . . . ." (343 N.W.2d at p. 34, italics added.) The court's holding was premised on the intent of Congress to protect the preexisting rights of mortgagors during the transition period. (*Ibid.*)

The OTS 1996 preemption regulation was in place at all times relevant to this case. Thus, retroactivity is not an issue here. The incorporation of

existing state law into the loans did not render existing federal law inapplicable. (See *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta, supra,* 458 U.S. at p. 157.)

### C. *NBA Preemption*

■ The NBA was designed to prevent the states from imposing "[d]iverse and duplicative . . . limitations and restrictions" on the powers of national banks to engage in the business of banking. (*Parks, supra,* 54 Cal.4th at p. 386, quoting *Watters v. Wachovia Bank, N. A.* (2007) 550 U.S. 1, 13–14 [167 L.Ed.2d 389, 127 S.Ct. 1559] (*Watters*).) States may regulate national banks so long as they do not " 'prevent or significantly interfere with' " the exercise of powers by the banks or by the OCC, which regulates them under the NBA. (*Parks,* at p. 386, quoting *Watters,* at p. 12.) State regulations that significantly impair the banks' exercise of enumerated or incidental powers under the NBA are preempted. (*Parks,* at p. 386, citing *Barnett Bank, supra,* 517 U.S. at pp. 32–34.)

In 2004, the OCC amended 12 Code of Federal Regulations parts 7 (bank activities and operations) and 34 (real estate lending) to add provisions clarifying the applicability of state law to national banks. (69 Fed.Reg. 1904, 1905 (Jan. 13, 2004).) Specifically, the OCC's preemption regulation regarding real estate lending was amended to read: "Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning" such matters as the "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." (12 C.F.R. § 34.4(a)(10).) The regulation included a savings clause for laws, such as contract laws, that "are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers." (12 C.F.R. § 34.4(b).)[16] The lists of preempted and exempted state laws in this regulation were substantially (but not completely) identical to those in the OTS's preemption regulation (12 C.F.R. § 560.2). (69 Fed.Reg. 1904, 1911, fn. 56 (Jan. 13, 2004).) The OCC declined to occupy the field of real estate lending, noting however that, due to significant federal presence, there is no presumption against preemption in the national bank context. (69 Fed.Reg. 1895, 1896–1897 (Jan. 13, 2004); 69 Fed.Reg. 1904, 1911 (Jan. 13, 2004).)

---

[16] Pursuant to the Dodd-Frank Act, this regulation was amended to delete the first sentence from paragraph (a) and to tie the savings clause to the conflict preemption standard of *Barnett Bank, supra,* 517 U.S. 25. (76 Fed.Reg. 43549, 43558 (July 21, 2011).)

We begin our preemption analysis under the NBA by addressing appellants' arguments that servicing third party loans is not lending for purposes of 12 Code of Federal Regulations part 34.4 (2013), and that the real estate lending preemption regulation does not apply unless the federal thrift made the loans it services.

### 1. *Real Estate Lending by National Banks*

Title 12 United States Code section 371, part of the NBA, authorizes national banks to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to . . . such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." (12 U.S.C. § 371(a).) In addition, national banks can "exercise . . . all such incidental powers as shall be necessary to carry on the business of banking." (12 U.S.C. § 24, seventh.) Servicing is considered a nonbanking activity that is "a proper incident to banking." (See 12 C.F.R. § 225.25 (2013).) The national banks' power to service loans as agents for others used to be the subject of a separate regulation. (12 C.F.R. § 7.7379 (1987).) The regulation was removed in 1996 as no longer necessary since the OCC considered this power to be well established. (61 Fed.Reg. 4849, 4860 (Feb. 9, 1996).)

Respondents argue that banks "make real estate loans" whenever they exercise any of the real estate lending powers enumerated in 12 United States Code section 371, part of the NBA, and that the OCC preemption regulation necessarily covers servicing loans made by others since servicing is incidental to real estate lending. Alternatively, they argue that servicing third party loans is an exercise of the banks' lending powers since it is listed, along with processing, origination, sale or purchase of, or investment or participation in mortgages, among the activities not subject to state regulation. (12 C.F.R. § 34.4(a)(10) (2013).)

By its own terms, the OCC's preemption regulation allows banks to fully exercise their federally authorized real estate lending powers and to make real estate loans under 12 United States Code section 371, part of the NBA, without regard to certain state law limitations. (12 C.F.R. § 34.4(a) (2013).) Section 371(a) is titled "[a]uthorization to make real estate loans." (12 U.S.C. § 371(a).) This title supports respondents' position that making real estate loans for purposes of the OCC's regulation encompasses all powers listed in the statutory provision.

Indeed, the OCC has recognized that banks make loans both directly and indirectly, as in "table funding" arrangements, where the bank funds the loan at settlement when it takes assignment of the loan. (OCC, Interpretive Letter

No. 1002 (Aug. 2004).) The banks' power to purchase loans also is within the scope of the preemption regulation if the loans are purchased as part of a real estate lending program. (OCC, Interpretive Letter No. 1016 (Feb. 2005) p. 3.) The OCC declined to apply the preemption regulation in a case where banks did not originate, fund or purchase the loans in question, but acted as trustees for securitized loans bought by investors. (*Ibid.*) The OCC reasoned that in those circumstances, "the effect of any liability for violation of the [state consumer fraud law] ultimately falls on the investors. Nowhere do the Banks allege that they themselves, as opposed to the trusts they represent, are exposed to liability for any violation of the [state law]. For all these reasons, 12 U.S.C. § 371 and 12 C.F.R. § 34.4(a) simply do not apply to the transactions by which the Banks acquired legal title to the loans in the circumstances at issue here." (*Ibid.*)

Appellants argue by analogy that the OCC's preemption regulation does not apply in cases where banks service third party loans that they neither originate, nor fund or purchase. The banks' servicing authority in such cases is not incidental to their purchasing loans, but to their purchasing the right to service third party loans. (12 C.F.R. § 3.3 (2013).) The right to impose late fees is one of the rights servicers acquire, and late fees are part of the compensation for servicing the loans. (See Thompson, *Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications* (Dec. 2011) 86 Wash. L.Rev. 755, 802 [servicers entitled to receive miscellaneous fees from borrowers].) Unless preemption applies, servicers are exposed to liability for any violation of state law with regard to misapplying payments and charging improper late fees. (See, e.g., *Young v. Wells Fargo & Co.* (S.D. Iowa 2009) 671 F.Supp.2d 1006, 1018 (*Young*) [bank allegedly "perpetrated a scheme to defraud by imposing repeated drive-by property inspections and improper late fees"].) Thus, while a trustee's insulation from liability may place it outside the scope of the real estate preemption regulation, it is less clear that the OCC would consider servicers to be outside its scope.

Appellants' narrow interpretation of the OTS and OCC preemption regulations is inconsistent with their simultaneous reliance on their savings clauses. Were we to conclude that servicing third party loans is not a real estate lending power within the scope of the OCC's regulation, then the entire regulation, including its savings clause, would not apply. But the preemption analysis would not end there since there may be other grounds for preempting appellants' breach of contract claim. Respondents argue that, to the extent that it pertains to late fees, appellants' claim is preempted as a usury claim under 12 United States Code sections 85 and 86, part of the NBA. We consider this argument next.

### 2. *Usury Claims Under the NBA*

■ Title 12 United States Code section 85, part of the NBA, establishes the rate of interest a national bank "may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt . . . ." (12 U.S.C. § 85.) This rate of interest is generally tied to the rate allowed in the state where the bank is located. (12 U.S.C. § 85; *Marquette Nat. Bank v. First of Omaha Corp.* (1978) 439 U.S. 299, 310 [58 L.Ed.2d 534, 99 S.Ct. 540] [national bank located in state named in its organization certificate].)[17] Section 86 of the NBA provides remedies for a knowing violation of section 85: forfeiture of all interest or recovery of double the interest paid. (12 U.S.C. § 86.) Sections 85 and 86 "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant . . . relies entirely on state law." (*Beneficial Nat. Bank v. Anderson* (2003) 539 U.S. 1, 11 [156 L.Ed.2d 1, 123 S.Ct. 2058] (*Beneficial*).) Thus, state law claims based on the rate of interest charged by national banks are preempted by the NBA. (*Beneficial*, at p. 11.)

■ The OCC distinguishes between fees and charges that constitute interest and those that do not. The former are explicitly made subject to federal law. (See, e.g., 12 C.F.R. §§ 7.4008(d)(10), fn. 6 (2013) [non-real-estate loans], 34.4(a)(12), fn. 1 (2013) [real estate loans].) The latter are the subject of a separate regulation. (12 C.F.R. § 7.4002 (2013).) Interest under section 85 of the NBA includes late fees. (12 C.F.R. § 7.4001(a) (2013); *Smiley v. Citibank (South Dakota), N. A.* (1996) 517 U.S. 735, 744–745 [135 L.Ed.2d 25, 116 S.Ct. 1730] [upholding 12 C.F.R. § 7.4001 (2013)].) Unlike the OTS, the OCC did not list late fees among the loan-related fees state laws cannot regulate. Instead, it provided generally that "limitations on charges that comprise rates of interest on loans by national banks are determined under Federal law." (12 C.F.R. § 34.4(a)(12), fn. 1 (2013), citing 12 U.S.C. § 85 & 12 C.F.R. § 7.4001 (2013).)

■ A number of courts have declined to treat a claim for improperly imposed fees, including late fees, as a usury claim for purposes of the NBA where the plaintiffs did not challenge the rate or amount of fees, but rather the bank's allegedly dishonest practices and methods of enticing borrowers to accrue fees or of assessing undisclosed fees. (See *West Virginia ex rel. McGraw v. Capital One Bank USA N.A.* (S.D.W.Va., July 22, 2010, No. 3:10-0211) 2010 WL 2901801, and cases cited.) Since Wells Fargo followed the payment application method disclosed in the deeds of trust, this

---

[17] Wells Fargo represents that, for purposes of 12 United States Code section 85, part of the NBA, it is located in South Dakota. The record on appeal does not include a request that this fact be judicially noticed, but it is not contested.

case does not present a fraudulent activity on its part. The allegations that the Akopyans were improperly assessed late fees for one additional month at the rate of 6 percent arguably gives rise to a claim of usury. By assessing double the allowable fees of 6 percent, the bank indirectly exceeded the allowed 10 percent maximum in section 10242.5, subdivision (a). On the other hand, Karapogosyan was allegedly assessed late fees over two months at the rate of 5 percent. As to her, Wells Fargo cannot be said to have exceeded the maximum rate of 10 percent. Thus, not all of appellants' allegations give rise to a usury claim against Wells Fargo.

Respondents argue that 12 United States Code sections 85 and 86, part of the NBA, preempt state usury claims against national banks, regardless of whether the banks made the loans in question. They rely on *Beneficial, supra,* 539 U.S. 1, which held that state usury claims against national banks were completely preempted. (*Id.* at p. 11.) The national bank in *Beneficial* was undisputedly the lender. (*Id.* at p. 3.) Consistent with *Beneficial,* the OCC's preemption regulation applies to "limitations on charges that comprise rates of interest on loans by national banks." (12 C.F.R. § 34.4(a)(12), fn. 1 (2013).) But the *Beneficial* court did not consider whether sections 85 and 86 would preempt state usury claims made against a national bank that is not the actual lender on a loan.

The decisions of lower federal courts on this issue were recently reviewed in *Ubaldi v. SLM Corp.* (N.D.Cal. 2012) 852 F.Supp.2d 1190. As noted by that court, the weight of authority is that application of 12 United States Code sections 85 and 86, part of the NBA, depends on whether the actual lender on a loan is a national bank. (*Ubaldi,* at pp. 1194–1195.) The most often cited case on this issue is *Federal Deposit Ins. Corp. v. Lattimore Land Corp.* (5th Cir. 1981) 656 F.2d 139 (*Lattimore*). The *Lattimore* court held that section 85 did not apply to a loan made by a nonbank, then partially assigned to a national bank. (*Lattimore,* at p. 146.) The court reasoned that "[a]lthough the statute does apply to usurious discounting of a note by a national bank or to usurious loans disguised as purchases of notes from an intermediary, such does not appear to be the present case where the obligors do not claim that the bank either discounted the note or was the lender." (*Id.* at pp. 147–148, fn. omitted.) The holding of *Lattimore* has not been challenged.[18]

Assuming that the implied incorporation of the payment allocation requirement of section 10242.5 into appellants' loans is a limitation on the

---

[18] But see Olthoff, *National Bank Act Preemption in the Secondary Market* (2006) 123 Banking L.J. 401, 407–408 (arguing *Lattimore* should be limited to its facts); see also *Dannewitz v. EquiCredit Corp. of America* (2005) 362 Ill.App.3d 82 [298 Ill.Dec. 413, 839 N.E.2d 1060] (applying *Beneficial* where national bank subsidiary bought state-originated home loan).

rate of interest on those loans for purposes of 12 United States Code sections 85 and 86, part of the NBA, the weight of authority appears to be against holding that these sections apply if the actual lender on the loan is not a national bank. (*Ubaldi v. SLM Corp., supra*, 852 F.Supp.2d at pp. 1194–1195; *Lattimore, supra*, 656 F.2d at p. 146.) But the NBA does not preempt only state usury laws. As we noted, national banks are authorized to service loans of other lenders, and state laws may not significantly impair the enumerated or incidental powers of national banks by subjecting them to "diverse and duplicative . . . limitations and restrictions." (See *Parks, supra*, 54 Cal.4th at p. 386.) Thus, the question remains whether the incorporation into appellants' loans of a specific state statutory payment allocation requirement "significantly impair[s]" Wells Fargo's power to service the loans. (*Ibid.*)

### 3. Breach of Contract

■ National banks " 'are subject to state laws of general application in their daily business *to the extent such laws do not conflict with the letter or the general purposes of the NBA.*' " (*Parks, supra*, 54 Cal.4th at p. 391, quoting *Watters, supra*, 550 U.S. at p. 11.) Thus, contracts made by national banks " 'are governed and construed by State laws.' " (*Parks*, at p. 390, citing *National Bank v. Commonwealth* (1869) 76 U.S. 353, 362 [19 L.Ed. 701].) Broad state law doctrines against unreasonable charges or unconscionable contracts are not subject to preemption since they form part of the background law " 'applicable to all . . . commercial operations.' " (*Parks*, at pp. 389–390.)

Appellants represent that their breach of contract theory, based as it is on "axiomatic principles of California contract law," is consistent with the recognition that state law governs the interpretation and enforcement of contracts. But the question is whether the generally applicable principles of contract assignment and implied incorporation of existing law into contracts may be applied to subject a national bank to a specific state statutory payment allocation standard.

### a. The "State-imposed Requirement" Approach

■ Courts have applied the distinction between state-imposed and self-imposed obligations, which we discussed earlier, in the context of NBA preemption as well. Thus, breach of contract claims enforcing an express contractual obligation in a loan made by a national bank are not subject to preemption. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1484 [38 Cal.Rptr.3d 653].) The reason is that " 'a contractual requirement, although only enforceable under state law, is not "imposed" by the State, but rather is "imposed" by the contracting party upon itself.' " (*Ibid.*, citing *Cipollone, supra*, 505 U.S. at p. 526, fn. 24.)

Appellants suggest that when a national bank voluntarily chooses to service state-originated loans on behalf of others, in essence it agrees to abide by all their express and implied terms. This suggestion would obliterate the distinction between self-imposed and state-imposed obligations, which presumes that one does not voluntarily agree to be bound by terms not apparent on the face of the agreement.

Contrary to appellants' suggestion, the distinction has not been confined to the contracts of federal regulated entities. For instance, in *Decohen v. Capital One, N.A.* (4th Cir. 2012) 703 F.3d 216, 227 (*Decohen*) and *Epps v. JP Morgan Chase Bank, N.A.* (4th Cir. 2012) 675 F.3d 315, 326–327 (*Epps*), each involving a car dealer's assignment of a retail installment contract to a national bank, the Fourth Circuit recognized that " 'when a party to a contract voluntarily assumes an obligation to proceed under certain state laws, traditional preemption doctrine does not apply to shield a party from liability for breach of that agreement.' " (*Decohen*, at p. 227, citing *Wolens, supra*, 513 U.S. at p. 229 & *Cipollone, supra*, 505 U.S. at p. 526, fn. 24.) In considering whether the breach of contract claims were enforceable under Maryland state law, the court concluded that where a car dealer voluntarily chose to be bound by a state statute expressly referenced in the agreement, the assignee bank also was bound. (*Decohen*, at pp. 227–229, citing *Epps*, at pp. 327–328.)

*Young, supra*, 671 F.Supp.2d 1006, also is instructive. In that case, Wells Fargo serviced the class action plaintiffs' mortgage loans, but was not the lender on all of them. (*Id.* at p. 1012.) In relevant part, the plaintiffs alleged that the Wells Fargo's computer system was programmed to " 'stack' late fees by misapplying incoming payments after a missed payment" to "outstanding fees and costs before satisfying principal and interest," in violation of the express terms of the mortgage agreements. (*Id.* at pp. 1012–1013; see *id.* at p. 1035 & fn. 14.) The plaintiffs also alleged that the system was "intentionally designed and operated to defraud mortgagors," and that Wells Fargo's monthly statements were false or misleading. (*Id.* at p. 1013.) The asserted state law claims were for violations of various consumer statutes, all premised on the theory that Wells Fargo "perpetrated a scheme to defraud." (*Id.* at p. 1018; see *id.* at p. 1016.)

In denying preemption, the court in *Young* posited that "[t]he 'central inquiry' in considering conflict preemption is whether the legal duty that is the predicate of the common-law damages action directly conflicts with the governing federal law." (*Young, supra*, 671 F.Supp.2d at pp. 1021–1022, citing *Cipollone, supra*, 505 U.S. at p. 524.) The court noted that " 'laws of general application, which merely require all businesses (including banks) to refrain from fraud . . . do not impair a bank's ability to

exercise its lending powers and only "incidentally affect" the exercise of a national bank's powers.' [Citations.]" (*Young*, at p. 1022.)

In contrast to *Young*, this case is not premised on actions Wells Fargo took in direct contravention of the express terms of the loan agreements. On the contrary, its payment allocations were specifically authorized by the form "Fanny Mae/Freddie Mac" [*sic*] deeds of trust, which are typically used for loans to be sold on the secondary market.[19] Appellants select the payment allocation standard in section 10242.5, which is more favorable than the payment allocation method set forth in their loan agreements. They ignore the less consumer-friendly aspects of section 10242.5, such as its unusually high maximum rate of late fees (10 percent of the installment due) and its shorter (10-day) grace period than the 15-day grace period in Karapogosyan's loan. Courts have declined to apply preemption in cases where national banks selectively take advantage of state laws that benefit them while attempting to avoid the limitations of those laws. (See *Decohen, supra*, 703 F.3d at p. 228; *Epps, supra*, 675 F.3d at p. 328; *Aguayo v. U.S. Bank, supra*, 653 F.3d at p. 925.) In this case, the opposite is true. Appellants seek to subject Wells Fargo to a limitation on late fees in section 10242.5, when neither the state lenders nor Wells Fargo chose to benefit from its lender-friendly aspects.

We agree with respondents that requiring Wells Fargo to comply with the payment application standard in section 10242.5 as an implied term of appellants' loans is a state-imposed obligation that significantly impairs its servicing powers. Respondents note that late fees in California are variously regulated by a number of statutes. Additionally, several other states have enacted laws regulating various aspects of late fees. (See 1 Nelson & Whitman, Real Estate Finance Law (5th ed.) § 6.10.) The breach of contract claim that appellants advance goes beyond the simple application of contract law principles. In states like California with more than one late fee statute, it exposes Wells Fargo to the expense and uncertainty of litigating, in the first instance, what statute applies to the loans it services. It also requires Wells Fargo to operate under diverse payment application schemes for loans it services in California and other states despite the uniform payment application terms of the mortgages it services. This is inconsistent with the purpose of the NBA to prevent the states from imposing "diverse and duplicative . . . limitations and restrictions" on its power to engage in the business of banking. (See *Parks, supra*, 54 Cal.4th at p. 386.)

---

[19] "Fannie Mae and Freddie Mac require that loans they purchase be documented on their forms. Therefore, originators who wish to sell their loans to Fannie Mae or Freddie Mac must use the uniform instruments. Even lenders who do not contemplate selling their loans to [Fannie Mae or Freddie Mac] typically use the forms, which have become the standard for loans sold on the secondary market." (Forrester, *Fannie Mae/Freddie Mac Uniform Mortgage Instruments: The Forgotten Benefit to Homeowners* (2007) 72 Mo. L.Rev. 1077, 1085, fns. omitted.)

Wells Fargo is entitled to NBA preemption under the circumstances.

b. *Assignee Liability*

Since appellants do not distinguish between HOLA and NBA preemption, they rely on case law decided under either statute. We already have addressed the authorities relevant to resolving the preemption issue under the HOLA. The principal case on which appellants rely for their assignee liability claim under the NBA is *Thomas v. U.S. Bank Nat. Assn. ND* (8th Cir. 2009) 575 F.3d 794 (*Thomas*). Their reliance on this case is misplaced for several reasons.

In *Thomas, supra,* 575 F.3d 794, the Eighth Circuit's one-paragraph discussion of preemption was limited to whether 12 United States Code sections 85 and 86, part of the NBA, completely preempted a Missouri statute limiting closing costs and fees on high cost residential second mortgage loans that were assigned to national banks. (575 U.S. at pp. 796, 800–801.) The court's conclusion that the state statute was not preempted was based on a provision of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., as amended by the Home Ownership and Equity Protection Act of 1994 (HOEPA; Pub.L. No. 103-325 (Sept. 23, 1994) 108 Stat. 2190), which states: "Any person who purchases or is otherwise assigned a [HOEPA] mortgage . . . shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage . . . ." (15 U.S.C. § 1641(d)(1); see *Thomas*, at p. 801.)[20]

Since the Eighth Circuit did not discuss any other grounds on which NBA preemption may apply to the banks before it, *Thomas* does not stand for the broad proposition that the NBA does not preempt claims against national banks unless they made the loans in question. The *Thomas* court did not explain why the HOEPA assignee liability provision was relevant to the analysis of NBA preemption, and neither do appellants. Appellants have not alleged that their loans were subject to the HOEPA, and we have no reason to conclude that assignee liability on state law claims under the HOEPA was intended to be imposed broadly regardless of the type of loan, the nature of the assignment, or the claim asserted. Importantly, servicers are not subject to liability under the HOEPA unless they own (or owned) the loan obligation. (15 U.S.C. § 1641(f).)

 Appellants are concerned that applying federal preemption in the context of servicing third party loans would allow a state-licensed lender to

---

[20] "HOEPA provides additional protections to consumers and requires additional disclosures for certain types of mortgage loans, generally based on the annual percentage rate or the total amount of points and fees paid." (*In re Thomas, supra,* 476 B.R. at p. 696.)

avoid the requirements of state law by hiring a federal servicer to collect fees and then pay them back to the lender. Courts look at the underlying reality of a transaction in order to determine who the real party in interest is for purposes of preemption. (See *Krispin v. May Dept. Stores Co.* (2000) 218 F.3d 919, 924.) The complaints in this case allege that the late fees are for the servicers' own benefit and are retained by them. We do not consider whether federal preemption would apply under a different set of facts.

## DISPOSITION

The judgments are affirmed. The parties are to bear their own costs on appeal.

Willhite, J., and Suzukawa, J., concurred.

The petition of all appellants for review by the Supreme Court was denied June 26, 2013, S210680. Baxter, J., did not participate therein.